KIPP, Appellant, vs. SMITH, Executor, and another, Respondents.

*November 14—December 15, 1908.*

*Bills and notes: Trial: Questions for jury: Bona fide purchasers: "Bad faith:" Holder in due course: Gross negligence: Sales of territory for nonpatented articles: Good consideration.*

1. Where there is no direct evidence showing that plaintiff, indorsee of a promissory note, knew the nature of the consideration thereof, but there was much evidence of a circumstantial character tending to show that he had considerable knowledge of the business in which the original payees of the note were engaged and of the circumstances under which such note, and others which he purchased at the same time, were given, it was not error to submit to the jury the question whether the plaintiff was a holder in due course.

2. Sec. 1676—26, Stats. (Supp. 1906), governing negotiable instruments, provides that, to constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounts to bad faith. Hence it is error to instruct the jury that if the plaintiff, indorsee of a promissory note, had notice of facts which would put a man of ordinary intelligence and prudence upon inquiry, he would be charged with knowledge of the facts which the inquiry would have shown, and that, if he was guilty of gross negligence in not following up the inquiry which facts known to him suggested, the law would charge him with notice of all the facts which he might have ascertained by the inquiry, and he could not be a purchaser in good faith.

3. While gross negligence is evidence from which bad faith may be inferred, it does not of itself constitute bad faith as matter of law.

[4. Whether a person can be said to be a holder of a negotiable instrument in due course who, without inquiry, takes from an officer of a corporation, in payment of a private debt, a negotiable note which appears on its face to be the property of the corporation, suggested, but not decided.]

5. In order to be a holder in due course the transferee must take the instrument "in the usual course of business."

6. While in the case of a nonpatented article there can be no such thing as the sale of territory or exclusive territorial rights in the sense in which the terms are used with regard to patented articles, such selling rights may constitute good consideration for promissory notes.

APPEAL from a judgment of the circuit court for Brown county: S. D. HASTINGS, Circuit Judge. *Reversed.*

This is an action upon a promissory note for $250, which was one of four notes executed by Howard J. Smith (respondent *Irving C. Smith's* testator) and *William L. Pfeiffer* to the Advance Fire Appliance Company, a partnership, on October 31, 1903. The partnership was composed of one Scheuer and one Weinsheimer, and was engaged in manufacturing and selling an unpatented dry compound for extinguishing fires, prepared from a secret formula and known as "Blaze Killer," and which was put up in tin tubes having on the outside a design composed of a shield and trefoil with the words "Blaze Killer" thereon, which was labeled a trademark but never recorded or copyrighted. The compound had been upon the market since its discovery in 1899 by one Schaffer and had attained some general sale. The consideration of the notes (which in all amounted to $950) consisted in the agreements of a written contract executed on the same day by the parties. This contract recited that whereas the defendants had purchased from the first parties and paid for "the right and privilege for the exclusive sale of its fire extinguisher (Blaze Killer) in Brown county, Wisconsin, it was agreed;" then followed a statement of the fixed price per dozen, viz. $6, at which for a term of ten years the first parties were to sell the Blaze Killer to defendants in any quantity the defendants might wish; an agreement that, should the first parties sell any Blaze Killers to any one within the said county, they would maintain a price five times as great as that charged the defendants and pay to defendants the difference monthly; a provision that no sales

should be made by defendants outside of the territory, but, if any were made, that defendants should pay to the first parties one half of the sums received in excess of the contract price; also a provision that the contract should become void in case three dozen were not sold by defendants in any year; and a further provision giving the defendants one half of the amount paid for exclusive agency rights in other territory by any purchaser whom they obtained.

Soon after the contract was made a domestic corporation was formed, of which Scheuer became president, and the partnership transferred to the corporation all its business and property, including the note in suit, which was specially indorsed by the partnership to the order of the corporation without recourse. On December 2, 1903, the defendants surrendered the previous contract to the corporation and received in exchange a new contract executed by the corporation and themselves, which was intended to take the place of the previous contract. It stated that the corporation had appointed the defendants its agents for the sale of Blaze Killer and such other articles as it might place on the market, and that it sold to the defendants the "exclusive privilege for the sale of its extinguishers and other goods" in Brown, Calumet, and Oconto counties. This agreement fixed the prices at which Blaze Killer should be furnished to defendants up to January 1, 1921, at $6 per dozen for cash, but, in case notes had been given for territorial rights, then the price should be $13.50 per dozen cash, of which $7.50 was to be indorsed on the notes until the notes were fully paid, after which the price was to be $6. It contained the same stipulation as the former agreement as to the prices which the corporation would maintain and the amounts which it would pay to the defendants in case it sold Blaze Killer to any other persons within the territory, with a proviso that, in case such sales were made by any agent working for the corporation under a similar contract, the defendants should

rely only on the agreement of such agent to turn over to the corporation, for the benefit of defendants, one half of the amount of such sales exceeding $6 per dozen. It also contained a stipulation that if defendants sold any Blaze Killer outside of their territory they would report same to the corporation and turn over to it monthly one half of the amounts so received in excess of $6 per dozen for the benefit of the agents having the right to such territory, failure to do which should *ipso facto* terminate the contract. It also contained like provisions as to the termination of the contract in case three dozen were not sold in any year and as to the amount to be paid to defendants in case they secured a purchaser for additional territory, except that such amount was to be twenty-five per cent. of the proceeds instead of one half.

The note in suit was payable one year after its date, and on the 7th of May, 1904, the plaintiff received it from Scheuer in payment of a personal obligation to him from Scheuer, and it was then indorsed: "Pay to *B. A. Kipp* without recourse. Advance Fire Appliance Company by Joseph F. Scheuer, Prest., F. L. Grieb, Secy." The plaintiff claimed to be a *bona fide* holder before due, but the defendants claimed that he took the note with knowledge of the facts, and that there was in fact no consideration for it. The trial court held as matter of law that there was no consideration, and submitted to the jury the single question whether the plaintiff bought the note in the usual course of business in good faith, for value, and without notice of what it was given for. The jury answered this question in the negative, and, judgment being rendered for the defendants, the plaintiff appeals.

For the appellant there were briefs by *Sheridan & Evans,* and oral argument by *W. L. Evans.*

For the respondents there was a brief by *Cady, Strehlow & Jaseph,* and oral argument by *S. H. Cady* and *M. H. Strehlow.*

Winslow, C. J.    There was no direct evidence showing
that the plaintiff knew the nature of the consideration given
for the note in suit, but there was much evidence of a circum-
stantial character tending to show that he had considerable
knowledge of the business in which the original payees of
the note were engaged and of the circumstances under which
this note, and others which he purchased at the same time,
were given.    There was no error, therefore, in submitting
the question whether the plaintiff was a holder in due course
to the jury; but the serious question on this branch of the
case is as to the correctness of the charge of the court.

The court instructed the jury, in substance, that, if the
plaintiff had notice of facts which would put a man of ordi-
nary intelligence and prudence upon inquiry, he would be
charged with knowledge of the facts which the inquiry would
have shown; and that, if he was guilty of gross negligence
in not following up the inquiry which facts known to him
suggested, the law would charge him with notice of all the
facts which he might have ascertained by the inquiry, and
that he could not be a purchaser in good faith.    This, we
think, was error.    The Negotiable Instrument Law—sec.
1676—26, Stats. (Supp. 1906)—provides that, "to constitute
notice of an infirmity in the instrument or defect in the title
of the person negotiating the same, the person to whom it is
negotiated must have had *actual knowledge* of the infirmity
or defect, or knowledge of such facts that his action in tak-
ing the instrument amounted to bad faith."    By the great
weight of modern authority, gross negligence is evidence
from which bad faith may be inferred, but it does not of
itself constitute bad faith as matter of law.    That is a ques-
tion for the jury after consideration of all the evidence.
1 Daniel, Neg. Inst. §§ 774, 775, and cases cited in notes;
4 Am. & Eng. Ency. of Law (2d ed.) 300; 7 Cyc. 944, 945.
Such is substantially the rule adopted by this court in *Kelley
v. Whitney,* 45 Wis. 110, and *Boyle v. Lybrand,* 113 Wis. 79,
83, 88 N. W. 904.

Another question has presented itself to our minds in this connection which seems worthy of very serious consideration, but as it was not raised or argued in either court and is not necessary to be now decided we express no opinion upon it. The question is this: Can a person be said to be a holder in due course who, without inquiry, takes from an officer of a corporation, in payment of a private debt, a negotiable note which appears on its face to be the property of the corporation? In order to be a holder in due course he must take it "in the usual course of business." Is such a transaction in the usual course of business in view of the principle that one who takes in payment of a private debt the promissory note of a corporation, executed by the debtor as an officer of the corporation, is charged with notice of any fraud or irregularity that may exist in its execution? *Hiawatha I. Co. v. John Strange P. Co.* 106 Wis. 111, and cases cited on p. 116 (81 N. W. 1034). We merely suggest this question now. The case must go back for a new trial in any event, and upon such new trial the question of actual notice should again be submitted to the jury by proper special question. Should the jury again find actual notice the question above suggested will be immaterial, but if they find to the contrary the question above suggested can be answered by the court after due consideration and argument, as the facts bearing upon it seem to be undisputed.

Upon the question of consideration the trial court held, as matter of law, that there was no consideration because, the Blaze Killer not being a patented article, there could be no sale of exclusive territorial rights in it, and as the defendants bought only territory or territorial rights they received no consideration. We cannot regard this ruling as correct. It is true that in the case of a nonpatented article there can be no such thing as the sale of territory or exclusive territorial rights in the sense in which those terms are used with regard to patented articles; but the sole agency for the sale of a nonpatented article in a given city or county may be a

desirable and valuable privilege, notwithstanding neither party can prevent others from invading the territory and selling the same or similar articles which they have purchased elsewhere. The value of the privilege will depend, of course, upon the desirability and good repute of the article and the ease or difficulty with which it may be simulated or purchased elsewhere. Such selling rights in desirable non-patented articles are frequently given, and no reason is perceived why, in the absence of other grounds of invalidity, they may not constitute good consideration for promissory notes. *Clark.v. Crosby,* 37 Vt. 188; *Roller v. Ott,* 14 Kan. 609; *Keith v. Herschberg O. Co.* 48 Ark. 138, 2 S. W. 777.

The case of *Apollinaris Co. v. Scherer,* 27 Fed. 18, which was largely relied upon by respondents' counsel, holds nothing to the contrary of this doctrine. In that case the owner of a mineral spring in Europe had granted to the plaintiff the exclusive right of export and sale in this country of the mineral water. Third persons, however, purchased the water in Europe from the owner of the spring and imported it to this country and sold it in competition with the plaintiff. The action was brought against these third persons to prevent them from doing this, but it was held that the owner of the spring could not grant any exclusive territorial right which would prevent those who had lawfully purchased the water in Europe from bringing it to this country and selling it in competition with the plaintiff. But it is further said in the case that there would seem to be no doubt that the agreement was a valid agreement as between the parties, and that if the owner of the spring were endeavoring to compete with the plaintiff in the sale of the water in this country, the agreement could be enforced by injunction.

*Prima facie,* therefore, there was a valuable consideration for the note, especially as there was testimony tending to show that Blaze Killer was an article which had acquired some general sale. It may perhaps be shown that the right.

was of no value or that the contract was induced by fraudulent representations of fact, upon which the defendant relied; but neither of these facts appeared in the evidence without controversy so that the court could take them from the jury.

*By the Court.*—Judgment reversed, and action remanded for a new trial.