[L. A. No. 3182.   In Bank.—April 11, 1914.]

NELLIE M. FOWLES et al., Appellants, v. THE NA-
TIONAL BANK OF CALIFORNIA (a Corporation),
Respondent.

Pledge — Property to Which Pledgor has No Title — Estoppel
Against True Owner.—One in possession of personal property can
ordinarily transfer to another, by pledge or sale, no greater inter-
est in the property than he himself has; but where the owner of
the property clothes another with the apparent title to, or power of
disposition over it, and an innocent third party is thereby induced
to deal with the apparent owner in reference thereto, the true owner
may be estopped from afterward asserting his title.

Id.—Corporate Stock—Indorsement in Blank and Delivery as Col-
lateral Security—Subsequent Pledge of Stock by Holder.—
Where the owner of corporate stock indorses the certificates in
blank and delivers them to the payee of his promissory note to
secure the payment thereof, and thereafter the payee of the note,
without the knowledge of the owner of the stock, separates the cer-
tificates from the note to which they were pinned when delivered,
and hypothecates them as collateral security for the payment of his
own indebtedness to a bank, upon the representation that he is
the true owner of the stock, the bank may retain the stock, as
security for the payment of the debt due to it, and the original
pledgor cannot recover possession thereof.

Id.—Community Property in Stock—Shares Standing in Name of
Wife—Transfer by Her Alone.—In such case a contention that
the stock was in fact community property, and that the blank as-
signment was by the wife alone, is unavailing, where the stock stood
on the books of the corporation in her name; for under section 325
of the Civil Code one taking stock standing on the books of a cor-
poration in the name of a woman, married or single, has the right
to assume, in the absence of something reasonably sufficient to cre-
ate a suspicion to the contrary, that she is the sole owner thereof
and is empowered to transfer the same, and, under such circum-
stances, he is not called upon to make any inquiry in regard thereto.

Id.—Declaration of Dividends—Knowledge by Pledgee.—The fact
that the bank had knowledge that monthly dividends were being
declared on the stock, yet failed to demand and collect them, is not
evidence of bad faith in the taking of the stock.

Id.—Knowledge That Pledgor is Stockholder—Whether Puts
Pledgee on Inquiry.—Nor does the fact that the bank knew its

pledgor was a stockbroker, as a matter of law, put it upon inquiry as to his powers with relation to the stock when the same was offered by way of pledge.

ID.—CONSIDERATION FOR PLEDGE—PRE-EXISTING INDEBTEDNESS.—The bank was a pledgee for value, although the stock was pledged to secure the payment of a pre-existing indebtedness of the pledgor.

ID.—PROMISSORY NOTE—PRE-EXISTING DEBT AS CONSIDERATION.—A pre-existing debt is a sufficient consideration for the execution of a promissory note.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order refusing a new trial. George H. Hutton, Judge.

The facts are stated in the opinion of the court.

Wm. Lewis, for Appellants.

Oscar A. Trippet, and John E. Biby, for Respondent.

ANGELLOTTI, J.—This is an appeal by plaintiffs, who are husband and wife, from a judgment in favor of defendant, and from an order denying their motion for a new trial, in an action brought by them to recover possession of certain stock certificates representing thirty shares of stock of the Union Oil Company of California, a corporation, of which they allege themselves to be the owners and entitled to possession.

The facts of the case are established by a stipulation of the parties, which is included in a bill of exceptions. The trial court gave judgment that plaintiffs take nothing.

So far as is material to the controlling considerations in this case, the facts are as follows: Defendant is a duly organized banking corporation. Plaintiffs, as has been said, are husband and wife. In September, 1908, they purchased the shares of stock here involved. The same are community property. The certificates therefor were issued in the name of plaintiff Nellie M. Fowles, and have ever since stood in her name in the books of the corporation. On the back of the certificates was a form to be used in transferring the stock, as follows:

"For value received................hereby sell, assign and transfer unto ...........................

shares,

shares,

shares,

of the capital stock represented by the within certificate, and do hereby irrevocably constitute and appoint...............
attorney to transfer the said stock on the books of the within named company with full power of substitution in the premises.

Date................19....

Endorsement:''

On December 29, 1909, Nellie M. Fowles signed her name after the word ''Endorsement'' on each of the certificates of stock thus: ''Nellie M. Fowles,'' and she and her husband then delivered the certificates together with certificates for thirty other shares, to one C. B. Miner, as collateral security for the payment of a certain note of Mr. Fowles to said Miner, dated December 29, 1909, and being for four thousand dollars. On account of the principal of this note two thousand dollars has been paid, and the other thirty shares pledged as collateral have been returned to the pledgors. When the certificates in question were delivered to Miner by plaintiffs, they were pinned to the note. Subsequently Miner separated such certificates from the note, and without the knowledge or consent of either plaintiff, hypothecated them and the stock represented thereby, with defendant, as collateral security for an indebtedness of his own to said defendant. At the time of the original delivery of said certificates to defendant, Miner stated to it that he owned the stock represented thereby, and defendant believed from the statements made by Miner, from the name of Nellie M. Fowles indorsed thereon, and the possession of the certificates by Miner, that he was such owner, and continued to so believe until sometime in August, 1910. Except for such belief it would not have accepted such stock as security. Defendant never had any knowledge or notice of the claim of plaintiffs or either of them until sometime in August, 1910. About that time Miner absconded, and is now a fugitive from justice and wholly insolvent. Then plaintiffs first learned of the disposition made by Miner of their stock, and defendant first learned of the claim of plaintiffs. Up to

that time defendant had no personal acquaintance with and had never met plaintiffs or either of them. Miner's indebtedness to the defendant has not been satisfied, and a sale of the stock of plaintiffs is essential to its payment. The Union Oil Company has paid a regular monthly dividend ever since September, 1908, and that it was paying such dividends was a matter of general and common knowledge among business men and bankers of the city of Los Angeles, where defendant's business was conducted. Defendant never claimed or received any of said dividends, and plaintiffs have been paid all of the same. Defendant had no knowledge or information that plaintiffs or either of them were receiving any of such dividends. Prior to the commencement of this action, plaintiffs tendered to defendant all amounts due from them to Miner, and demanded return of the stock.

Defendant claims that under these circumstances, it is entitled to retain the stock as security for Miner's debt to it. If this claim be well founded, as the trial court concluded, plaintiffs must necessarily fail in this action for the recovery of the possession of the stock.

Of course, Miner had no authority to alienate the stock pledged to him by plaintiffs beyond the title actually possessed by him, or to pledge the same to another as security for his own debt, and his action in so doing was a gross fraud on plaintiffs. As between him and plaintiffs, the latter were the owners of the stock, notwithstanding the pledge. And it is also well established that "the general rule is, that one in possession of personal property can transfer to another by pledge or sale, no greater interest in the property than he himself has." (*Chase* v. *Whitmore*, 68 Cal. 545, 547, [9 Pac. 942, 944].) As said, however, in the case just cited: "There are exceptions to this rule, where the property consists of negotiable instruments, or what comes under the general denomination of currency, *and where the owner of the property clothes another with the apparent title to, or power of disposition over it, and an innocent third party has thereby been induced to deal with the apparent owner in reference thereto, the true owner being in such case held estopped from afterward asserting his title. (McNeil* v. *Tenth Nat. Bank,* 46 N. Y. 325, [7 Am. Rep. 341]; *Moore* v. *Metropolitan Nat. Bank,* 55 N. Y. 41, [14 Am. Rep. 173].)'' (The italics are

ours.)  In *McNeil* v. *Tenth Nat. Bank,* a case that has repeatedly been cited approvingly by this court, the exception last stated was applied to shares of corporate stock.  This case is almost exactly similar in its material facts to the case at bar. In fact, we can see no difference, unless there be a difference by reason of the fact that the stock in this case was community property of Mr. and Mrs. Fowles, and Mr. Fowles did not sign the indorsement.  We consider this difference immaterial here, as will be seen from what we say later.  In that case, the owner had delivered the certificate for the shares of stock to his brokers, as security for any balance that might be due them.  There was a blank form of assignment on the back thereof, which the owner signed, without filling in the blanks.  The brokers subsequently pledged these shares without authority from the owner, to a bank, as security for their own indebtedness, without having filled in the blanks in the assignment.  The bank took in good faith, and without notice of the owner's claim.  It was held that it was entitled to retain the stock as security for the indebtedness due it from the brokers, upon the ground that the plaintiff had conferred upon his brokers such an apparent title to or power of disposition over the shares, as estopped him from asserting his own title, as against the parties who took *bona fide* through the brokers.  It was recognized that ''the mere possession of chattels, by whatever means acquired, *if there be no other evidence of property or authority to sell from the true owner,* will not enable the possessor to give a good title.''  But it was said: ''But if the owner intrusts to another, not merely the possession of the property, but also written evidence over his own signature, of title thereto, and of an unconditional power of disposition over it, the case is vastly different.  There can be no occasion for the delivery of such documents, unless it is intended that they shall be used, either at the pleasure of the depositary, or under contingencies to arise.  If the conditions upon which this apparent right of control is to be exercised are not expressed on the face of the instrument, but remain in confidence between the owner and the depositary, the case cannot be distinguished in principle from that of an agent who receives secret instructions qualifying or restricting an apparently absolute power.''  It was held that the fact that the blank assignment was not filled in was imma-

terial, and that the common practice of passing the title to stock by delivery of the certificate with blank assignment and power had been repeatedly shown and sanctioned in cases coming before the courts, and that a party to whom such a certificate is delivered is authorized to fill it up by writing a power and transfer over the signatures. (See, also, Jones on Pledges and Collateral Securities, sec. 163.) It was declared to be well settled that, as between the parties, the delivery of the certificate, with assignment and power indorsed, passes the entire title, legal and equitable, in the shares. This is the settled rule in this state. (Civ. Code, sec. 324; *Graves* v. *Mono Lake etc. Mining Co.,* 81 Cal. 303, 325, [22 Pac. 665].) *Spreckels* v. *Nevada Bank,* 113 Cal. 272, 276, [54 Am. St. Rep. 348, 33 L. R. A. 459, 45 Pac. 329].) It was further held that the holder of such a certificate and power possesses all the external *indicia* of title to the stock, and an apparently unlimited power of disposition over it. It was then said: "Such then being the nature and effect of the documents with which the plaintiff intrusted his brokers, what position does he occupy toward persons who, in reliance upon those documents, have in good faith advanced money to the brokers or their assigns on a pledge of the shares? When he asserts his title, and claims, as against them, that he could not be deprived of his property without his consent, cannot he be truly answered that, by leaving the certificate in the hands of his brokers, accompanied by an instrument bearing his own signature, which purported to be executed for a consideration, and to convey the title away from him, and to empower the bearer of it irrevocably to dispose of the stock, he in fact 'substituted his trust in the honesty of his brokers, for the control which the law gave him over his own property,' and that the consequences of a betrayal of that trust, should fall upon him who reposed it, rather than upon innocent strangers from whom the brokers were thereby enabled to obtain their money"? This question is answered in the affirmative. The decision was placed upon the well-established principle "that, where the true owner holds out another, or allows him to appear, as the owner of, or as having full power of disposition over the property, and innocent third parties are thus led into dealing with such apparent owner they will be protected. Their rights in such cases do

not depend upon the actual title or authority of the party with whom they deal directly, but are derived from the act of the real owner, which precludes him from disputing, as against them, the existence of the title or power which, through negligence or mistaken confidence he caused or allowed to appear to be vested in the party making the conveyances.''

This case, as we have said, has been repeatedly cited by this court approvingly so far as this declaration is concerned, and the principle therein set forth applied. (See *Chase* v. *Whitmore*, 68 Cal. 545, 547, [9 Pac. 942]; *Woodsum* v. *Cole*, 69 Cal. 142, 144, [10 Pac. 331]; *Dover* v. *Pittsburg Oil Co.*, 143 Cal. 501, 505, [77 Pac. 405]; *Conklin* v. *Benson*, 159 Cal. 785, 793, [36 L. R. A. (N. S.) 537, 116 Pac. 34]; *Shirey* v. *All Night and Day Bank*, 166 Cal. 50, [134 Pac. 1001]. See, also, Jones on Pledges and Collateral Securities, sec. 466.)' It was recognized as applicable to certificates of stock so indorsed, although they are not negotiable instruments, in *Barstow* v. *Savage M. Co.*, 64 Cal. 388, 392, [49 Am. Rep. 705, 1 Pac. 349], but it was held in that case that it was not applicable to such certificates in the event that they were *stolen* from the true owner without his fault or negligence. In *Arnold* v. *Johnson*, 66 Cal. 402, [5 Pac. 796], this principle was applied in the case of a certificate of stock delivered so indorsed to another for a special purpose, and he without authority pledged the same for his own debt. The court said that the difference between this case and *Barstow* v. *Savage M. Co.*, 64 Cal. 388, [49 Am. Rep. 705, 1 Pac. 349], was that in this case the owner *voluntarily* delivered the indorsed certificate to the person who pledged it, and thus *allowed* him to assume the apparent ownership thereof, while in *Barstow* v. *Savage M. Co.*, 64 Cal. 388, [49 Am. Rep. 705, 1 Pac. 349], the certificate was *stolen,* and the owner *did not allow* another to assume the apparent ownership. The court said: ''The distinction is an important one, and brings this case within the rule stated in *McNeil* v. *Tenth Nat. Bank,* 46 N. Y. 325, [7 Am. Rep. 341], cited approvingly in *Barstow* v. *Savage M. Co.*, 64 Cal. 388, [49 Am. Rep. 705, 1 Pac. 349].'' The same principle was applied in *Ambrose* v. *Evans*, 66 Cal. 74. The effort of learned counsel to show that these cases are not controlling, based upon the claim that

they were decided under a special statute (Stats. 1877–78, p. 835), which was repealed in 1880, [Stats. 1880, p. 120], is not convincing.   A reading of the statute shows that it is extremely doubtful whether it could be held to be applicable to such cases as the ones referred to.   But in any event, the cases referred to were in fact decided without reference to such statute, and upon the principle we have discussed.   We have already quoted from *Chase* v. *Whitmore,* 68 Cal. 545, 547, [9 Pac. 942], relied on by counsel as establishing the true rule since the repeal of such special statute, and have shown that it recognizes and approves the equitable rule declared in *McNeil* v. *Tenth Nat. Bank,* 46 N. Y. 325, [7 Am. Rep. 341]. *McNeil* v. *Tenth Nat. Bank* was approvingly quoted from in *Brittain* v. *Oakland Bank of Savings,* 124 Cal. 289, [71 Am. St. Rep. 58, 57 Pac. 84], both as to the equitable principle relied upon by defendant, and as to the effect of the delivery of a stock certificate with blank assignment.   We are unable to see how it can be successfully contended, in view of the decisions of this court involving the application of the equitable rule referred to, that Miner's pledge of this stock to defendant was not effectual as against plaintiffs, provided defendant took in good faith, without notice, and for a valuable consideration.   The views declared in *Arnold* v. *Johnson,* 66 Cal. 402, [5 Pac. 796], have never been receded from in this state, and we see no reason why such facts as there appeared and here appear do not bring a case fairly within the operation of the rule.   It is conceded that where the ownership of the person dealing with personal property as his own is evidenced by his *possession* only, a purchaser or pledgee from such person takes subject to the rights of the true owner, even though he be a *bona fide* purchaser or pledgee for value, and the rule above referred to does not apply.   But where such person has not only the possession, but also written *indicia* of ownership, with which he has been voluntarily furnished by the true owner, the principle is applicable.   The true owner, by thus voluntarily holding him forth as the owner, is estopped from denying his ownership as against those who take from him in good faith and for a valuable consideration.   Appellants here could easily have protected themselves against any improper disposition of the stock by Miner by writing upon the certificates the terms upon which he held them.

All claims of appellants based upon the fact that the stock was in fact community property, and that the blank assignment was signed by the wife only, appear to be fully answered by the provisions of section 325 of the Civil Code. The shares stood on the books of the Union Oil Company in the name of the wife alone. That section, as amended in 1905, [Stats. 1905, p. 397], provides: "Shares of stock in corporations standing on the books of the corporation in the name of a married woman may be transferred by her, her agent or attorney, without the signature of her husband, and in the same manner as if such married woman were a *feme sole.*" Prior to the amendment of 1905 the section provided that such stock as was "held or owned" by a married woman could be so transferred. The code commissioner's note to the section states that the amendment is designed to make it clear that shares of stock standing in the name of a married woman are presumed to be her separate property, and that they may be dealt with by her as such, in the absence of proof and notice to the contrary. We do not see how, in the face of this statute, it can be doubted that one taking stock standing on the books of a corporation in the name of a woman, married or single, has the right to assume, in the absence of something reasonably sufficient to create a suspicion to the contrary, that she is the sole owner thereof and is empowered to transfer the same, and that, under such circumstances, he is not called upon to make any inquiry in regard thereto. No case has been cited by appellants that would support any different conclusion. *Leiper's Appeal,* 108 Pa. St. 377, is clearly distinguishable from the case at bar, as is demonstrated in respondent's brief. The statute is clear and unambiguous, and does not appear to admit of any other construction. It is proper also to note, as bearing on the delivery of the certificates to Miner, that the husband himself secured the indorsement of the wife, and personally delivered the certificates indorsed by her to Miner. This fact, however, has no bearing on the question of notice to defendant.

It may be conceded that defendant knew that monthly dividends were being declared by the Union Oil Company. It had no information that any of the dividends declared were being paid to plaintiffs or either of them, so far as the stock pledged by it to Miner was concerned. Certainly no duty rested upon it,

in so far as plaintiffs were concerned, to make any inquiry in regard to this matter in the absence of notice of circumstances sufficient to create a suspicion that such payment was being made. We do not think that the mere fact that it must be held to have known that the stock stood on the books of the corporation in the name of Mrs. Fowles created such a duty. The circumstances in this connection are such that it cannot be held that they render the conclusion of the trial court that defendant took in good faith one not sufficiently supported by the facts shown. A reasonable explanation of the failure of defendant to demand and collect the dividends would be that it was entirely content with the security afforded by the shares, without regard to the dividends, and for that reason did not interest itself in the matter of collecting them.

The stipulation of facts states that Miner was a customer of defendant; that he was a broker, and daily dealt in corporate stocks; that he had theretofore often borrowed money from defendant and hypothecated corporate stocks therefor; that it was a usual and customary thing for him to have certificates of stock which showed on the face thereof that the stock had belonged to some other person than himself, and which were indorsed in blank, and that it was the custom of the said bank to make loans to said Miner, and to many other customers, upon stocks so held and indorsed. It is claimed that the mere fact that defendant knew that Miner was a stockbroker was sufficient, as a matter of law, to put it upon inquiry as to his powers with relation to this stock when the same was offered by way of pledge, the idea being that as it is the business of such a broker to buy and sell stocks for others, it is reasonable to assume that stock so indorsed in his hands is the property of others, and that while it may fairly be assumed that he has the power to sell such stock, it may not be assumed that he has the power to pledge it or otherwise treat it as his own property. We are unable to see any force in this claim, and certainly no such distinction is recognized by the cases brought to our attention, with the possible exception of one or two Maryland cases, which are in conflict with the authorities generally. The McNeil case was, as we have seen, one involving an unauthorized pledge by the brokers of the owner. The same is true of *Shattuck*

v. *American Cement Co.*, 205 Pa. St. 197, [97 Am. St. Rep. 735, 54 Atl. 785], cited by appellants, where the court said, in relation to a certificate of stock indorsed in blank by the owner to his brokers, who had without authority pledged the same, that where one by his own act arms another with power to act for him, he who so arms the wrongdoer must suffer for the consequences of the wrongdoing, and that there was nothing to put the pledgee on inquiry. The stock was held to be subject to the unauthorized pledge. (See, also, *Woods' Appeal*, 92 Pa. St. 379, [37 Am. Rep. 694, 695].) In *Ryman v. Gerlach*, 153 Pa. St. 197, [25 Atl. 1031, 26 Atl. 302], it was simply held by a majority of the court that the evidence on the question of good faith should have been submitted to the jury.

We are satisfied that the conclusion of the lower court to the effect that the defendant took the stock in good faith and without notice cannot be held to be erroneous. There was no actual notice to it of circumstances sufficient to put a prudent man upon inquiry as to Miller's ownership thereof.

There is no force in the claim that renewals and extensions given by defendant to Miner, and the redelivery to him of certain securities pledged, without the knowledge or consent of plaintiffs, operated to release the stock from the pledge. All renewals and extensions and redeliveries were prior to any disclosure to defendant of the fact of plaintiff's ownership. Plaintiffs, of course, were neither guarantors nor sureties. They had not guaranteed the payment of Miner's debt to the defendant, nor had they pledged their stock to defendant for Miner's debt. Defendant had no knowledge whatever concerning them, and had no transaction with them. So far as it was concerned, Miner was pledging his own stock for his own debt. The cases cited by counsel upon this point are in no way applicable to the case at bar.

It is urged that defendant cannot be held, under the circumstances of this case, to have taken the stock in pledge for a valuable consideration. This contention is based on the claim that the stock was pledged by Miner to secure the payment of a pre-existing indebtedness on his part to defendant. According to the answer, the pledge was made on June 10, 1910, to secure the payment of a note given by Miner on that day to defendant for fourteen thousand dollars then loaned

to him, and interest. The stipulated facts show that this note was given by Miner for the balance then due by him to defendant on a note for thirty-two thousand dollars which was then past due, given by him to defendants prior to May 10, 1910, which latter note was given in renewal of notes *theretofore* given by him to defendant for loans of money actually made, and on which he paid to defendants on June 10, 1910, eighteen thousand dollars, and the interest then due. Among these previous loans actually made was one of one thousand five hundred dollars, made on January 4, 1910, for the repayment of which Miner at that time actually pledged twenty of said shares as collateral security. The remaining ten shares he pledged at the time of giving the thirty-two thousand dollar note, and the whole thirty shares thenceforth remained with defendant as collateral security for the indebtedness of Miner, as evidenced, first, by the thirty-two thousand dollar note, and subsequently by the fourteen thousand dollar note.

Looking only to the transaction of June 10, 1910, and regarding the stock as then originally pledged, it is clear that, under our decisions, the defendant was a pledgee for value. In *Stroud* v. *Thomas,* 139 Cal. 274, 275, [96 Am. St. Rep. 111, 72 Pac. 1008], it was said that the contention of the appellant that a pre-existing debt is not a sufficient consideration for the execution of a note, so far as the sureties thereon are concerned, where the obligation for the pre-existing debt is canceled upon the delivery of the new note, did not merit discussion, and that it is well settled that such a consideration is sufficient as a foundation for the promise of the sureties, as well as that of the principal. In *Frey* v. *Clifford,* 44 Cal. 342, a mortgage of land taken to secure an antecedent debt was held to be one taken for a valuable consideration, the court recognizing that there was a great conflict in the decisions of other jurisdictions, but saying that the matter was settled in this state by earlier decisions of this court. (*Payne* v. *Bensley,* 8 Cal. 266, [68 Am. Dec. 318]; *Robinson* v. *Smith,* 14 Cal. 94, 98; *Naglee* v. *Lyman,* 14 Cal. 450.) It was held in that case that the mortgagee was a purchaser for a valuable consideration within the meaning of that clause in the act concerning conveyances, which provides that every conveyance of real estate that shall not have been

recorded, shall be void as against any subsequent purchaser in good faith *and for a valuable consideration,* which conveyance shall have been first duly recorded. In *Davis* v. *Russell,* 52 Cal. 611, [28 Am. Rep. 647], a warehouse receipt for wheat had been pledged to a bank by one Barney, to whom it had been intrusted for some purpose by the owner, as security for Barney's antecedent debt, and it was decided that upon the authority of the earlier decisions, "it must be held that the pre-existing debt of Barney to the bank constituted a valuable consideration within the meaning of section" 2991 of the Civil Code, the section providing that one who allows another to assume the apparent ownership of property for the purpose of making any transfer of it, cannot set up his own title to defeat a pledge of the property "made by the other to a pledgee who received the property in good faith, in the ordinary course of business, *and for value."* In *Schluter* v. *Harvey,* 65 Cal. 158, [3 Pac. 659], it was held that a pre-existing indebtedness was a valuable consideration for the purchase of land, sufficient to make the purchaser one for value. In *Hart* v. *Church,* 126 Cal. 471, 480, [77 Am. St. Rep. 195, 58 Pac. 910], it was held: "It is well settled in this state that the extinguishment or security of a pre-existing debt constitutes a valuable consideration for the sale or assignment of property." In *Foorman* v. *Wallace,* 75 Cal. 554, [17 Pac. 680], it was said that it had often been held that a conveyance in consideration of the cancellation of pre-existing indebtedness is a conveyance for a valuable consideration, within the meaning of section 1214 of the Civil Code, a section heretofore referred to. The law as thus settled is applicable, at least in the absence of a showing of some equity in favor of plaintiffs, other than the mere fact that they are the rightful owners of the stock. Whatever may be the rule in some other jurisdictions, *prima facie* at least, defendant, receiving the stock as security for a note given for the cancellation of an old indebtedness, was, as against plaintiffs, a pledgee for value. The stipulated facts show that this was some two months before Miner absconded, and was at a time when he was apparently solvent, and when, in fact, he paid defendant eighteen thousand dollars and interest on account of his indebtedness. Defendant, relying upon his apparent ownership of the stock, in good faith took and continued to

hold the same, as security for the note, which he then gave. Miner afterward became insolvent and absconded. There is nothing in the equities of the case, as shown by the facts, to warrant us in holding, in view of our decisions, that as against plaintiffs, defendant was not a pledgee for a valuable consideration. We recognize fully that there is a great conflict in the decisions in other jurisdictions on this point, and that there is much to be said in support of a contrary doctrine, but we regard the matter as definitely settled in this state by a long line of decisions.

The fact that Miner may have been guilty of a crime in connection with these certificates is altogether immaterial, under the circumstances of this case. What we have already said in regard to the rule declared in *McNeil* v. *Tenth Nat. Bank,* 46 N. Y. 325, [7 Am. Rep. 341], sufficiently answers the claim to the contrary.

In view of what we have said, no other point suggested in the brief of plaintiffs requires notice.

The judgment and order denying a new trial are affirmed.

Sloss, J., Shaw, J., Lorigan, J., and Melvin, J., concurred.