[Civ. No. 8841. Second Appellate District, Division Two.—November 28, 1934.]

RICHARD BARTHELMESS, Respondent, v. WM. CAVA-LIER et al., Appellants.

O'Melveny, Tuller & Myers, Pierce Works and Jackson W. Chance for Appellants.

Mott, Vallee & Grant and Kenneth E. Grant for Respondent.

YANKWICH, J., *pro tem.*—■ Under the provisions of section 629 of the Code of Civil Procedure, when a motion for judgment notwithstanding the verdict is made in the alternative—reserving the right to move for a new trial in case it is denied—the subsequent granting of a motion for a new trial cannot affect the right of appeal, given specifically by subdivision 2 of section 963 of the Code of Civil Procedure. We have such a situation here.

After the verdict of a jury in favor of the plaintiff and against all the defendants except Gerald E. Arbuckle, the trial court granted the motion of appellants for a new trial upon the ground of insufficiency of the evidence. It may be added, although the fact has no particular bearing upon the questions presented upon this appeal, that the court also granted the plaintiff's motion for a new trial as to the defendant Arbuckle. But appellants prosecute an appeal from the order of the court denying a motion for a directed verdict and for a judgment notwithstanding the verdict. It is

obvious that the object sought by them is an order for a judgment in their favor. To this order they are entitled as of right, if the motion for a directed verdict should have been granted.

■ The rendering of a judgment notwithstanding the verdict is made by section 629 of the Code of Civil Procedure to depend upon the existence of grounds for the granting of a motion for a directed verdict. See *Estate of Fleming,* 199 Cal. 750 [251 Pac. 637]; *Estate of Yale,* 214 Cal. 115, 124 [4 Pac. (2d) 153]. The power to direct a verdict is as stated in *Estate of Yale, supra,* "touching that state of the evidence, the same as the right of the court to grant a nonsuit at the conclusion of the evidence". And the right is to be exercised only when, after giving to the testimony of the plaintiff its full scope and indulging in all favorable and legitimate inferences from it, there is no substantial evidence to support a verdict for the plaintiff. (*Estate of Caspar,* 172 Cal. 147, 150 [155 Pac. 631]; *Estate of Flood,* 217 Cal. 763, 768 [21 Pac. (2d) 579].) "Unless it can be said as a matter of law that, when so considered, no other reasonable conclusion is legally deducible from the evidence, and that any other holding would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it upon appeal, or the trial court to set it aside as a matter of law, the trial court is not justified in taking the case from the jury." (*Estate of Lances,* 216 Cal. 397, 400 [14 Pac. (2d) 768]. See *Taylor* v. *Volfi,* 86 Cal. App. 244 [260 Pac. 927], and *Hellman* v. *Los Angeles Ry. Corp.,* 135 Cal. App. 627, 633 [27 Pac. (2d) 946, 28 Pac. (2d) 384].) And in determining whether the evidence is legally sufficient every presumption is in favor of the plaintiff, and he is entitled to have drawn from the testimony every proper inference favorable to his cause of action. (*Berger* v. *Lane,* 190 Cal. 443, 452 [213 Pac. 45]; *Singleton* v. *Hartford Fire Ins. Co.,* 105 Cal. App. 320, 326, 327 [287 Pac. 529].)

■ The nature of the order appealed from requires a rather detailed discussion of the facts out of which the controversy arose. The action was for conversion of corporate shares and debentures of the value of $72,225, according to the allegations of the complaint. The verdict of the jury

was for $62,672.91, in favor of the plaintiff and against all defendants excepting Arbuckle.

The plaintiff, Richard Barthelmess, is a motion picture actor. In August of 1930 Barthelmess had in his employ, as his secretary, Dallas S. Squire. Barthelmess and Squire had met in 1913, while they were both attending college. The friendship then formed resulted, in 1926, in the employment of Squire as secretary by Barthelmess. Barthelmess described his duties as consisting of making out checks for running expenses, keeping books for income tax purposes and of expenditures, carrying out instructions in regard to investments, communicating with brokers with regard to securities bought and sold and taking care of deposits in banks. He denied that Squire was his business manager or that he took care of all his financial affairs. He stated positively that Squire "never without my consent or approval would purchase anything for me". On December 21, 1928, Barthelmess executed to Squire a power of attorney, giving and granting him the power, *in his name* and for *his use and benefit,* to exercise the almost all-embracing acts enumerated in a general power of attorney.

At the time of the transaction which formed the basis of the action, August 29, 1930, this power of attorney stood unrevoked. The relationship between Squire and his employer was of the friendliest. Barthelmess stated at the trial that he counted Squire his "closest friend". Barthelmess was the owner of 800 shares of the capital stock of Chapman Ice Cream Company, of bonds or debentures of the Platt Music Company in the amount of $25,000 and of 1,000 shares of the capital stock of Transamerica Company. These securities were on deposit with Frank P. Parish & Co., Ltd., who were Barthelmess' brokers. Gerald D. Arbuckle, one of their salesmen, handled the Barthelmess securities, he having brought over the account from another house which had previously employed him. They stood in the account of Richard Barthelmess, and Arbuckle and Kennedy Boardman, resident partner and managing officer of Parish & Company at Los Angeles, knew that the securities belonged to Barthelmess. At the time Parish & Company were engaged in "pushing" a certain stock known as Missouri-Kansas Pipeline stock. Shortly before August

28, 1930, Arbuckle suggested to Squire that some of this stock be purchased for the account of Barthelmess. Squire would not agree. To induce the purchase Arbuckle stated that Boardman would guarantee the stock against loss up to 5,000 shares. Squire, however, still was of the view that it would not be a good investment for Barthelmess. However, he said that Barthelmess, who was out of the city, had stated before leaving that he might use some of his securities as collateral, if he were going to purchase any stock on his own account. He finally agreed to purchase as much, *for his own account,* as the Barthelmess securities held by Parish & Company would purchase. Under date of August 26th, Boardman, who was out of the city, telegraphed from Denver agreeing to guarantee ''Barthelmess against loss'' in exchange for one-half of the profit, also agreeing to divide the brokerage equally if the stock sold at a profit. Arbuckle then spoke to Oscar N. Srere, a customer's man employed by Wm. Cavalier & Company. Srere and Arbuckle knew each other, they having both been employed by another brokerage firm years before. Arbuckle spoke to him of the intended purchase of 2,500 shares, and the following was Srere's reaction to the suggestion, as narrated by him from the stand: ''When I heard 2500 shares I said that I thought it better I took him back and let him speak to Mr. Harbach, who was in charge of the department. It was always a practice of ours anyway whenever a new account came into the office to take that account to Mr. Harbach, let him meet the account—let him meet the man or woman when present.''

E. L. Harbach was a general partner of Cavalier & Company. The purchase of 2,500 shares was agreed upon, upon a margin basis, and the Platt debentures and the Chapman shares were accepted in lieu of the margin. It had been estimated that the purchase would have required $50,000 in cash. Arbuckle was introduced to Harbach as a salesman for Parish & Company. He told him that he was opening the account for Boardman, because Boardman was out of the city and was not there to open it personally. Harbach never made inquiries of Arbuckle as to the ownership of the securities. Arbuckle did not

mention the name of either Barthelmess or Squire. It was understood that the purchase was to be strictly a margin purchase, to be held only for the duration of a pool then existing in the stock, and was to be closed when a profit had been realized. Arbuckle had never had any business transactions with Cavalier & Company. Upon learning that Arbuckle was a salesman for Parish & Company, Harbach insisted (in compliance with a rule of the New York Stock Exchange) that the permission of a resident partner be obtained to the trading by Arbuckle, and the latter thereupon dispatched a telegram to Boardman in Denver requesting the same. Boardman promptly replied giving the consent. In the meantime, through various sources, Harbach ascertained that Boardman was the resident partner and manager of Parish & Company. He also caused a credit inquiry to be made as to Arbuckle. But the report showed nothing specific about any ownership of property, other than that Arbuckle rented two houses and had a car—although there were no judgments, liens or charges against him. This led Harbach to state at the trial that they "found out that he was all right from about five different sources". Harbach asked no questions of either Srere or Arbuckle as to the ownership of the securities.

After receipt of the Boardman consenting telegram, Arbuckle brought over the Platt debentures and Chapman shares. The Platt debentures were "bearer" bonds, not in the name of anyone. The Chapman shares bore the "street name" (a term by which is designated the name of a person other than the owner, which is inserted for convenience of rapid trading) of *Harold C. Carr*, with the assignment properly executed by him and the signature guaranteed by Parish & Company, by *Harold C. Carr*. Carr was a cashier for Parish & Company. The transfer to his name had been made early in August at Squire's request, to facilitate the sale of the stock. When the securities were delivered they showed no ownership in Boardman, Barthelmess or Arbuckle, and Harbach saw them after they were delivered. As to the ownership of the securities Harbach made no investigation, and he testified that he did nothing more than to get the consent of

Boardman to the opening of the account by Arbuckle. The securities were delivered on August 29th. Between that date and September 8th, 2,500 shares of stock were purchased by Cavalier & Company. An account was opened in Arbuckle's name on August 29th and the account was credited with the Platt debentures and the Chapman shares. Between August 28th and September 8th, 2,500 shares were purchased, for which Cavalier & Company advanced against the collateral of the Barthelmess securities $50,650. After Boardman's return to Los Angeles he confirmed (at the request of Cavalier & Company) by letter dated September 10th, the authorization for the opening of the Arbuckle account. At the time of the delivery of the letter a conversation took place between Boardman and Srere which is very significant. In this conversation Boardman told Srere that Arbuckle "was really acting for Mr. Squire, who was Barthelmess' agent", and that because Barthelmess and Squire, his agent, did not wish their names to appear in the transaction it was to be kept "more or less confidential". The receipt of this information brought no comment from Srere, or inquiry as to where Arbuckle "got the securities".

By September 25th the Missouri-Kansas Pipeline stock had dropped considerably. Cavalier & Company asked for additional collateral. Squire thought that Boardman should advance it, as he was to share in the profit. When Boardman failed to advance it Arbuckle, upon Squire's authorization, delivered to Cavalier & Company 1,000 shares of Transamerica stock, which were still held in the Barthelmess account with Parish & Company. These were also in a street name, duly assigned and the assignment guaranteed both by Milton E. Giles Company and Parish & Company, by Carr. Additional collateral was called for on October 10th by Cavalier & Company. Arbuckle then told them that the account belonged to Squire and asked that it be transferred in his name, which was done October 16th. The conversation concerning the transfer was had with Harbach. When informed by Arbuckle that the account was to be transferred to the name of Squire, Harbach (according to the testimony of Arbuckle) said: "Mr. Squire is the secretary for Mr. Barthelmess, isn't he, or handles

Barthelmess' account, doesn't he?" to which Arbuckle replied: "Yes, that is the one." It may be inferred from this that Harbach knew at that time, that the account belonged to Squire and that the information which Boardman had given to Srere as early as September 10th had reached him. Otherwise his knowledge of the relationship between Squire and Barthelmess cannot be explained.

A day or so later Squire informed Harbach that the securities were not his. On October 20th Cavalier & Company telegraphed Barthelmess, who was in New York, asking him to protect the account. Barthelmess replied: "Lloyd Wright attorney for Dallas Squire advises Barneson and Company will take over Squire account and I hereby consent and approve." The answer to this message was a refusal to transfer unless the actions of Squire were ratified, contained in a telegram which also informed Barthelmess of the transactions. The reply from Barthelmess, dated October 22d, was: "If you hold any securities of mine it is without my knowledge or consent and I hereby demand their return to me." At the trial Barthelmess reiterated the statement contained in his last telegram, that Squire had no authority to use the securities for his own speculations. He denied having authorized such use before leaving Los Angeles, and stated that the first knowledge he had that the stock was being so used was upon receipt at New York of a letter written to him by Squire on October 14th and when he was asked to confirm such use by Cavalier & Company. Needless to say, Squire claimed that he was authorized; but as we are dealing with a motion for a directed verdict, we need not consider on this (or any other) point any of the contradictions to the foregoing facts, since the facts as outlined do not seem to us inherently improbable. No part of the money advanced was ever tendered to Cavalier & Company. Following the receipt of the Barthelmess demand they proceeded to liquidate the account through the sale of the securities. In this manner they reimbursed themselves for the money advanced. At the time of trial there remained in the account a credit of $43.04 and 93 shares of the Chapman stock.

We must now answer the following question: Do these facts (and the additional facts to be referred to in the

course of the discussion to follow) show a conversion by Squire and the acquisition of the property by Cavalier & Company under circumstances which would warrant a jury in inferring that they were not *bona fide* purchasers for value?

The stock certificates were not, at the time of the transaction, negotiable instruments. (*Powers* v. *Pacific Diesel Engine Co.*, 206 Cal. 334 [274 Pac. 512, 73 A. L. R. 1398].) They have since been made such by the Uniform Stock Transfer Act. (Civ. Code, sec. 330.22.) We are also inclined to the view that the reference in the Platt debentures to conditions in other instruments were not of such character as to render them nonnegotiable. (Stats. 1921, p. 471.) But the question becomes unimportant. The transaction was not severable. ■ If by reason of the non-negotiable character of the stock certificates, a certain duty devolved upon Cavalier & Company which they did not perform, their failure in this respect affects the entire transaction,—notwithstanding the fact that some securities may have been used as to which a different rule might apply. This is particularly true when we are dealing with a motion for a directed verdict. For let us assume, that by reason of the negotiable character of some of the securities, Cavalier & Company were protected as to them. Plaintiff would still be entitled to recover the value of the Transamerica and Chapman shares. ■ And a motion for a directed verdict does not lie, nor does a motion for a nonsuit, where the evidence shows a right to recover for any amount, even though it be less than the amount prayed for. (*Hancock* v. *Hubbell*, 71 Cal. 537 [12 Pac. 618]; *Zellner* v. *Wassman*, 184 Cal. 80 [193 Pac. 84]; *Martin* v. *Hall*, 219 Cal. 334, 339 [26 Pac. (2d) 288]; *Tracy* v. *Stock Assur. Bureau*, 132 Cal. App. 573, 581 [23 Pac. (2d) 41].)

■ In approaching the problem, it is to be borne in mind that it has been the tendency of courts to protect those dealing *in good faith* with an unfaithful agent, who, authorized to handle the property of his principal, has misapplied it,—where it appeared that the agent had the actual power to perform the act, not for his own, but for

the principal's benefit. (*Hambro* v. *Burnand,* (1904) 2 K. B. 10; *Hellmann* v. *Potter,* 6 Cal. 13, 15.)

And this irrespective of the fact that the third party dealing with the agent may not have known of the existence of the power. The fact of its existence, not the knowledge, serves the third party as a shield. (*Grange* v. *Judah Boas Co.,* 60 Cal. App. 484, 492 [213 Pac. 712]; *Wenban Estate, Inc.,* v. *Hewlett,* 193 Cal. 675 [227 Pac. 723].)

As to this, there is no disagreement between the parties to this appeal. The disagreement arises when we come to consider the elements of good faith. It is the contention of the appellants that "good faith" means the same thing whether applied to negotiable or to nonnegotiable instruments. ▇ It is, no doubt, the rule that when dealing with negotiable instruments,—unless there be something upon the face of the instrument, or the circumstances surrounding its negotiation, to arouse suspicion,—the purchaser (or pledgee) is not called upon to make inquiry concerning its execution or the consideration for which it was given, under penalty of having "bad faith" imputed to him. And it may be stated as the accepted rule, at the present time, that mere knowledge of facts sufficient to put a prudent person upon inquiry will not affect the position of one as a *bona fide* purchaser or pledgee. More is required, actual knowledge unless "the circumstances or suspicions are so cogent and obvious that to remain passive would amount to bad faith". (8 Cor. Jur. 501.)

This is the law in California. (Civ. Code, sec. 3147; *Popp* v. *Exchange Bank,* 189 Cal. 296 [208 Pac. 113]; *Goodale* v. *Thorn,* 199 Cal. 307 [249 Pac. 11]; *Security-First National Bank* v. *J. G. Ruddle Properties, Inc.,* 218 Cal. 435, 440 [23 Pac. (2d) 1016].) Title, like a stream, cannot rise higher than its source. No one can, therefore, transfer a better title than he has, unless by the principle of estoppel the true owner is estopped to assert his superior title. One who has stolen a chattel cannot convey a good title, even to a *bona fide* purchaser. But the owner of chattels who has entrusted another with *indicia* of ownership is estopped from asserting his own ownership against a *bona fide* purchaser for value. This upon the assumption that where one of two innocent persons must suffer by the

act of a third, he by whose negligence it happened must be the sufferer. (Civ. Code, sec. 3543; 24 R. C. L. 373–379; *Barstow* v. *Savage Min. Co.*, 64 Cal. 388 [1 Pac. 349, 49 Am. Rep. 705].)

The rule applies to pledges under the specific provisions of our code. (Civ. Code, sec. 2991; *Fowles* v. *National Bank of California*, 167 Cal. 653, 663 [140 Pac. 271]; *Rapp* v. *Fred W. Hauger Motors Co.*, 77 Cal. App. 417, 422 [246 Pac. 1067].)

The elements of *bona fides* in the law of sales, dissociated entirely from the question of negotiability, are: (1) a valuable consideration; (2) the absence of notice; and (3) the presence of good faith. (*Mayes* v. *Thompson*, 128 Mass. 561, 573 [91 So. 275].) And good faith is absent when facts and circumstances exist sufficient to excite suspicion and lead to inquiry. (See 55 Cor. Jur. 601, 606; *Rossman* v. *Ward*, 210 Mich. 426, 430 [178 N. W. 41]; *Mayes* v. *Thompson, supra; Boyd* v. *Bearce*, 48 Cal. App. 46, 50 [191 Pac. 560]; *Richlands Brick Corp.* v. *Hurst Hardware Co.*, 80 W. Va. 476, 479 [92 S. E. 685]; *Maxwell* v. *Brown Shoe Co.*, 114 Ala. 304, 310 [20 So. 1009].)

The existence of facts calculated to put a reasonable person upon inquiry, coupled with a duty to inquire will, if not pursued, deprive a person of his position as a *bona fide* purchaser. And inquiry becomes a duty when the facts are inconsistent with a perfect right in him who proposes to sell. It also exists where the facts of which the purchaser should be aware are calculated to awaken suspicion. Of necessity, no definite rule can be formulated as to what, in a particular instance, is sufficient to arose suspicion. But the better rule is that information even as to collateral facts which if pursued would have led to the discovery of the ultimate facts is sufficient to charge the person failing to pursue. (55 Cor. Jur. 605–615; 24 R. C. L. 385; 20 R. C. L. 346; see *Ocean Shore Ry. Co.* v. *Spring Valley Water Co.*, 218 Cal. 86, 88 [21 Pac. (2d) 588]; *Rossman* v. *Ward, supra;* see, also, *Wilkerson* v. *Thorp*, 128 Cal. 221, 224, 225 [60 Pac. 679]; *Ocean Shore Ry. Co.* v. *Spring Valley Water Co., supra.*) These principles are but an application and interpretation of the rule of constructive notice contained in section 19 of the

Civil Code, which declares that "every person who has actual notice of circumstances sufficient to put a prudent person upon inquiry as to a particular fact, has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he might have learned such fact."

The justice of the rule is apparent. The law should (and does) protect honest dealing. But it should not protect him who is so credulous as to close his eyes to signs of warning which, by ordinary prudence, should be heeded. When he fails to heed them, he may jeopard his position as (what might otherwise be) a *bona fide* purchaser. Because of the special nature of negotiable instruments,—of the ease and universality with which such instruments are and have been transferred for many years in order to supply a rapid flow of credit—special protection has been thrown by statute and courts around those who deal in them. But in the absence of a statutory mandate, or the mandate of California precedent, there is no reason for applying the rule to nonnegotiable instruments so as to distinguish them from goods, chattels or choses in action— which are not protected by the rules of negotiability. (See *Standard Dredging Co.* v. *Title Ins. etc. Co.*, 96 Cal. App. 93, 100 [273 Pac. 871].)

Appellants argue against the application of the harsh doctrine of constructive notice to sales of nonnegotiable securities. Because stock certificates have one attribute of negotiability, viz., the passing of title by indorsement in blank and delivery of the certificate, they would create a new classification for them, that of *quasi*-negotiable instruments. We know, however, of no authority which recognizes such classification. Nor do we think that the decisions of California courts dealing with *bona fide* purchasers (or pledgees) warrant the conclusion that the test of "good faith" in the case of nonnegotiable instruments is the same as in negotiable instruments.

*Fowles* v. *National Bank of California*, 167 Cal. 653 [140 Pac. 271], involved an unauthorized pledge of stock by one who had possession and *indicia* of ownership. The trial court found that the pledgee took it in good faith and without notice. In sustaining the ruling the court said, at page 663: "We are satisfied that the conclusion of

the lower court to the effect that the defendant took the stock in good faith and without notice cannot be held to be erroneous. There was no actual notice to it of circumstances sufficient to put a prudent man upon inquiry as to Miller's ownership thereof.'' It is apparent that the court recognized the application of the doctrine of constructive notice to such cases. It did so also in *Northwestern Portland Cement Co.* v. *Atlantic Portland Cement Co.*, 174 Cal. 308, 313 [163 Pac. 47], although it held there that the finding of *bona fides* was supported by the evidence and that a request for secrecy regarding the transaction was not ''necessarily inconsistent with an honest purpose on the debtor's part, or good faith on that of the creditor''.

In *Popp* v. *Exchange Bank*, 189 Cal. 296 [208 Pac. 113], the court after discussing the rule aplicable to negotiable instruments determined that the bonds there under consideration were not negotiable. For that reason it held that no title had passed to the misappropriated bonds. In the statement of the rule the court used language which was broader than the state of the law warranted. See *Powers* v. *Pacific Diesel Engine Co.*, 206 Cal. 334, 354 [274 Pac. 512, 73 A. L. R. 1398], in which the court held that the evidence did not warrant the finding of the trial court that the purchaser had not acted in good faith. Again, in *Peoples State Bank* v. *Penello*, 59 Cal. App. 174 [210 Pac. 432], the court determined, as a question of fact, after a verdict, that the facts in the particular case did not warrant the conclusion that there were no *bona fides* in the pledge of several promissory notes as security. The opinion clearly recognized constructive notice as an element to be considered even in such a case. Mr. Justice Burnett, writing the opinion of the court, stated: ''We think it equally plain that the only rational inference from the evidence is that plaintiff, in taking an assignment of said notes, acted in good faith and without knowledge, *either actual or constructive,* of any defect in the consideration therefor.'' (Italics added.) Neither is there anything in *Grange* v. *Judah Boas Co.*, 60 Cal. App. 484, 492 [213 Pac. 712], or in *Wenban Estate, Inc.,* v. *Hewlett*, 193 Cal. 675 [227 Pac. 723], which indicates that the courts in discussing the right of pledgees make the assertion of estoppel inde-

pendent of the existence of good faith. Nor is there in them any indication that the duty to inquire is not an element of good faith.

■ We conclude, therefore, that in dealing with instruments which are not negotiable the buyer will not be relieved of the duty to inquire, if the circumstances are such as to call for its exercise.

■ But even in the case of negotiable instruments, the existence of the circumstances to which section 19 of the Civil Code refers may be evidence of bad faith sufficient to go before a jury. (*Bowman* v. *Metzger*, 27 Or. 23 [39 Pac. 3, 44 Pac. 1090]; *Matlock* v. *Scheuerman*, 51 Or. 49 [93 Pac. 823, 17 L. R. A. (N. S.) 747]; *Arnd* v. *Aylesworth*, 145 Iowa, 185 [123 N. W. 1000, 29 L. R. A. (N. S.) 638].) The case last cited is especially in point. The question arose upon an appeal from an order directing a verdict in an action upon a promissory note, to which the defense of good faith had been pleaded. The court, while stating the general rule to be that mere failure to inquire will not affect the position of one as an innocent purchaser for value, and that there was uncontroverted testimony showing good faith, held nevertheless that because inferences inconsistent with good faith might have been drawn by the jury, there should have been no direction of a verdict. The court said: ''It is quite possible that the testimony as a whole may be *insufficient to justify an affirmative finding* of bad faith on the part of the plaintiff, and *still not be so conclusive of his good faith as to require a withdrawal of the question from the jury.*'' (Italics added.) See *Canjoharie Nat. Bank* v. *Diefendorf*, 123 N. Y. 191 [25 N. E. 402, 10 L. R. A. 676]. Similar language is found in *Matlock* v. *Scheuerman, supra,* and see *Kipp* v. *Smith,* 137 Wis. 234 [118 N. W. 848].

Because the authorities in the field of the law of sales are numerous, we have stressed in what precedes the doctrine of *bona fides* in relation to the law of sales. Of course, in the case at bar we are dealing with a pledge. But, as the discussion which precedes shows clearly, the principles just declared apply with equal force to pledges. Moreover, no valid reason could be advanced for not so applying them.

We conclude, therefore, that the duty to inquire exists,

and except where the evidence is legally conclusive upon the subject of good faith, it presents a question for the jury. And we are of the view that the circumstances surrounding the transaction in this case were such as to call for submission to the jury. The test of prudence is not subjective; it is objective. It postulates the existence of a criterion, upon the basis of common experience, which calls for action, under certain given circumstances, upon the part of prudent persons. ▪▪▪ We feel that the facts here presented were such as to justify the submission to the jury of the fact whether good faith existed. It is to be borne in mind that we are not dealing with the weight of the evidence. In considering the evidence for the purpose of the order appealed from, the rules laid down in *Berger* v. *Lane,* 190 Cal. 443, 452 [213 Pac. 45], must be brought into play. The court says: "Every favorable inference fairly deducible and every favorable presumption fairly arising from the evidence adduced must be considered as facts proved in favor of the plaintiffs. Where evidence is fairly susceptible of two constructions, or if one of several inferences may reasonably be made, the court must take the view most favorable to the plaintiffs. If contradictory evidence has been given it must be disregarded. (*Estate of Arnold,* 147 Cal. 583 [82 Pac. 252].)"

▪▪▪ Appellants contend that as they could have relied upon the power of attorney, even if they did not know of its existence (*Grange* v. *Judah Boas & Co., supra; Wenban Estate, Inc.,* v. *Hewlett, supra*), inquiry would have but led to that power, and it could well have stopped there. But we are not dealing here with a situation wherein a pledgee pleads actual authority. The transaction was not made in the name of the principal. The inquiry is not: What legal minimum would have satisfied the requirement to investigate? Nor is it: Might not the pledgee, upon discovering the true ownership, have been satisfied with the *prima facie* showing of the power? The question is rather: Would a prudent person, after opening a speculative, marginal account in the name of the salesman of a stock brokerage house which had but recently (three months before) opened an office in Los Angeles—a salesman who had no property of any value other than an automobile

(although he was renting two houses) upon discovering that the securities belonged to an undisclosed principal whose name was not mentioned at any stage of the transaction, and upon being shown the written authority to deal with the property, have stopped there? In such a situation, would not a prudent person have sought out the owner and inquired of him if the securities were being used with his consent? The inference is reasonable that a prudent person might have so acted. It follows, therefore, that these and other facts in the record warranted the submission of the question of good faith to the jury. For the facts lent themselves to the reasonable inference that Cavalier & Company, in failing to do so, had not complied with the test of prudence and were not purchasers in good faith.

It is true that Cavalier & Company paid value; but that is one element only of *bona fides*. It is also true that he who entrusts another with *indicia* of ownership must suffer the consequences, if through his action an innocent person is misled. But these are not the sole criteria for determining the validity of unauthorized transfers. The element of good faith must also exist. Without it the principles do not apply. And there were circumstances from which an inference of lack of good faith could have been inferred by the jury.

A directed verdict is not proper when the testimony is susceptible of different inferences, one of which is favorable to the plaintiff. (*Hall* v. *Barber Door Co.*, 218 Cal. 412, 415 [23 Pac. (2d) 279]; *Berger* v. *Lane, supra; McClurken* v. *Ralph's Grocery Co.*, 130 Cal. App. 529, 530, 531 [20 Pac. (2d) 66].) It follows that the motion for a directed verdict was properly denied, as was also the motion for judgment notwithstanding the verdict.

The order appealed from is affirmed.

Stephens, P. J., and Crail, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 28, 1934, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 24, 1935.