[S. F. No. 9597. In Bank.—July 11, 1922.]

LENORA S. POPP, as Guardian, etc., Appellant, v. EX-
CHANGE BANK (a Corporation), Respondent.

[1] BONDS—PLEDGE AS COLLATERAL SECURITY—TRANSACTION OF HUS-
BAND—PARTICIPATION OF WIFE—SUFFICIENCY OF EVIDENCE.—In this
action by a guardian against a bank to recover the possession of
certain bonds, which were alleged to be the property of plain-
tiff's minor children and which had been delivered to the defend-
ant by her husband as collateral security for the payment of their
promissory note to cover an overdraft of their joint account, and
which he represented were owned by his wife, the finding that the
plaintiff wife executed the note and collateral agreement for a valu-
able consideration is supported by the evidence.

[2] BANKS AND BANKING—HUSBAND AND WIFE—JOINT ACCOUNT—
HUSBAND'S OVERDRAFT—LIABILITY OF WIFE.—Where a bank
account was opened in the names of a husband and wife with
money belonging to the latter by the deposit of checks payable
to her, the husband's overdraft was as much her indebtedness as
his own, notwithstanding all of the checks against the account
were drawn by him with two exceptions.

[3] PROMISSORY NOTE—PRE-EXISTING DEBT—CONSIDERATION.—An ex-
isting debt is a sufficient consideration for a note or other com-
mercial instrument.

[4] BANKS AND BANKING—PLEDGE OF BONDS—RELIANCE UPON REP-
RESENTATION AS TO OWNERSHIP.—Where corporation bonds were
delivered by a husband to a bank to secure the payment of the
promissory note of himself and his wife to cover an overdraft of
their joint account, the bank had the right to rely upon the
representation of the husband that the bonds were owned by his
wife.

[5] ID.—NOTATION ON BONDS—INSUFFICIENT NOTICE OF OWNERSHIP.—
Where corporation bonds were pledged by a husband to a bank
to secure the payment of the promissory note of himself and his
wife to cover an overdraft of their joint account, the fact that
the names of the minors were written on the margin of the bonds,
did not constitute notice, actual or constructive, to the bank
that the minors owned them, or notice sufficient to cast upon the
bank the duty of making further investigation touching such owner-
ship, where the husband represented that his wife owned them
and they were of a character which passed by delivery without
indorsement.

[6] PROMISSORY NOTES—SUSPICION—DUTY TO MAKE INQUIRY.—Mere knowledge of facts sufficient to put a prudent man on inquiry, without actual knowledge, or mere suspicion of an infirmity or defect of title, does not preclude the transferee of negotiable paper from occupying the position of a holder in due course unless the circumstances are such as to justify the conclusion that the failure to make inquiry arose from a suspicion that inquiry would disclose a vice or defect in the instrument.

[7] BONDS — SECURITY OF PAYMENT BY TRUST DEED — NON-NEGOTIABILITY PRIOR TO 1915.—Bonds issued by a corporation in the year 1912 which show on their face that they are secured by a mortgage or trust deed on real property are non-negotiable instruments under the law of this state at that time, although payable to bearer.

[8] ID.—PURCHASER OF NON-NEGOTIABLE BONDS—TITLE ACQUIRED.—A purchaser of non-negotiable bonds, although he buys in good faith and for value, acquires only the title of the seller.

[9] ID.—AMENDMENT OF NEGOTIABLE INSTRUMENT LAW—PRIOR NON-NEGOTIABLE BONDS UNAFFECTED BY.—The act of the legislature of August 7, 1915, amending the code in relation to negotiable instruments so as to make bonds secured by mortgages or trust deeds negotiable did not have the effect of changing the character of such bonds issued before the amendment, although transferred thereafter, since the legislature cannot by an act subsequent to the execution of a contract change its legal effect in any material particular.

APPEAL from a judgment of the Superior Court of Sonoma County. Emmett Seawell, Judge. Reversed.

The facts are stated in the opinion of the court.

Edward A. O'Brien and W. W. Bedford for Appellant.

Wallace L. Ware and R. L. Thompson for Respondent.

SHURTLEFF, J.—The plaintiff and appellant, as guardian of the persons and estates of Alida Newell Popp and Mary Elizabeth Popp, her minor children, brought this action against the defendant bank for the possession of three bonds of the Adirondack Electric Power Corporation,

---

6. What circumstances are sufficient to put a purchaser of negotiable paper on inquiry, notes, 29 L. R. A. (N. S.) 351; 44 L. R. A. (N. S.) 395; L. R. A. 1918F, 1148.

alleged to be the property of said minors, and wrongfully in the possession of defendant.

The defendant in its answer admitted that the bonds were in its possession, but denied they were owned by said minors or that such possession was wrongful, alleging upon information and belief that they were the property of the said Lenora S. Popp and J. Popp, her husband, who is not a party to the action, and were delivered to defendant by said Lenora S. Popp and J. Popp as collateral security for the payment of their joint and several note to the defendant for the sum of two thousand four hundred dollars, dated July 13, 1916. Upon these issues the case was tried without a jury, and the court found that said note was on July 13, 1916, for a valuable consideration, executed and delivered by the said Lenora S. Popp and J. Popp to defendant, and that no part of the principal sum of said note had been paid; that upon said July 13, 1916, the said Lenora S. Popp and J. Popp, as a part of the same transaction, including the execution and delivery of said promissory note and agreement which accompanied the same and embodied the terms upon which said bonds were deposited with defendant as collateral, delivered to defendant at its banking house in the city of Santa Rosa, California, said three bonds, to be held by defendant "according to the terms and conditions of said collateral agreement," to wit, to secure the payment of said promissory note, "then and there representing to the officers and agents of said defendant, Exchange Bank, and inducing them to believe that said bonds belonged to and were the property of the said plaintiff, Lenora S. Popp, and her husband; that defendant accepted said bonds in good faith as security for the payment of said promissory note . . . , in the belief that said representation was true and without knowledge of or reason to suspect that it was not true." The court further found that said bonds had come into the hands of said Lenora S. Popp as a gift to said minors from an aunt, and were by said Lenora S. Popp placed in the custody of her husband and the father of said minors, and were not and never have been the property of said Lenora S. Popp or J. Popp. That said Alida Newell Popp was and is the owner of two of said bonds and said Mary Elizabeth Popp was and is the owner of one of said bonds. "That defend-

ant had no knowledge of the true ownership of said bonds or either of them, and had no reason to believe that said Lenora S. Popp and J. Popp were not the owners thereof and were without authority to pledge or sell the same.  The defendant bank is the lawful holder of each of said bonds as security and as a pledge for the payment of said promissory note, together with interest thereon.  That said bonds and each of them were negotiable instruments, payable to bearer in money only, and without any condition not certain of fulfillment for value, and were pledged as security . . . to defendant before maturity, in due course, and without fraud on the part of defendant.''  The conclusions of law were in accordance with the findings, and among other things ordered that plaintiff, as such guardian, had the right to redeem the bonds upon payment to defendant of the amount remaining due on said promissory note. Plaintiff in due time moved for a new trial, which motion was denied.  Judgment was entered accordingly in favor of defendant, from which judgment plaintiff prosecutes this appeal.

[1]  The first point which plaintiff makes for reversal is that the evidence is insufficient to sustain the findings, the specific attack being that there is no evidence in support of the finding ''that Lenora S. Popp, for valuable consideration, executed the note and collateral agreement—that she executed it at the banking house of respondent bank, or that she made any representations to any of the officials of said bank.''  We have carefully reviewed the record and find ample evidence to support the finding.  To be sure, there is present a conflict in the evidence, but where that is so this court will not disturb the finding of fact touching which the conflict exists.  An extended and detailed recital of the evidence sustaining the findings specifically assailed would be of little profit.  Suffice it to say, that during the period commencing in December, 1915, and extending to the date of the execution by the plaintiff and her husband of the note involved here, the account of the plaintiff and J. Popp with the defendant bank was in a continuous state of overdraft, and on the thirteenth day of July, 1916, the date of said note, this overdraft amounted to two thousand four hundred dollars, and it was to cover said amount that the note was executed and collateral deposited.  The bank

officials were pressing Mr. Popp to take care of this obliga-
tion, and notified him, so he testifies, that it would not cash
any more of his checks. The cashier of the defendant
testifies that he told Mr. Popp that "something had to be
done, we [defendant] couldn't let this thing run any
longer." It was this attitude of the bank that brought
about the execution of the note and the delivery as
collateral of the bonds, and at which time plaintiff had not
been appointed guardian of the persons or estates of her
minor children, she having been appointed in the month of
April, 1919. The account was in the names of the plain-
tiff, Lenora S. Popp and J. Popp, and was opened with
money belonging to plaintiff, by the deposit of checks pay-
able to her. [2] She thinks she never drew any checks
against the account, and in any event, not more than one
or two; nevertheless, the overdraft was in law as much her
indebtedness as that of her husband, and it is the law of
this state that a pre-existing debt is a valuable considera-
tion. (*Schluter* v. *Harvey*, 65 Cal. 158 [3 Pac. 659];
*Frey* v. *Clifford*, 44 Cal. 335; *Stroud* v. *Thomas*, 139 Cal.
274 [96 Am. St. Rep. 111, 72 Pac. 1008].) [3] In Tiede-
man on Commercial Paper (sec. 164) it is said: "It has
been generally held that an existing debt is a sufficient con-
sideration for a note or other commercial instrument. This
is true whether the existing debt is an open account or one
resting on an implied contract, or whether it is evidenced
by an instrument of indebtedness, which is surrendered for
the new instrument." Plaintiff admits that she knew that
her husband, J. Popp, was indebted to the defendant, but
did not know to what extent. When J. Popp delivered
the bonds to the defendant, he stated to the officer who re-
ceived them that they were bonds "my wife . . . got back
from the East," and that they "belonged to his wife."
The note and collateral agreement were signed by plaintiff
and her husband, J. Popp, but both testify positively that
they were signed at the Popp residence and not at the
place of business of the defendant. The officer of the bank,
who had charge of the transaction, testifies that to the best
of his recollection they were signed by both Popp and his
wife at the defendant's banking house. The court found
in accordance with the latter testimony, which appellant con-
tends does not sustain such finding. With this we cannot

agree, but in any event the decisive question was, were the instruments *actually* signed by Popp and his wife? If they were, the place of signing was immaterial, except, perhaps, as a matter of testing the accuracy of the memory of the witnesses. While plaintiff admits the verity of her signature to the note and collateral agreement, she asserts, and in that she is corroborated by her husband, that she signed both writings without reading either of them, and so signed upon the representation made to her by her husband that they were "merely copies of statements." Be that as it may, she intrusted the note, collateral agreement and bonds to her husband, J. Popp, who delivered them to the defendant, which received them in good faith, in due course, and with an entire want of knowledge, constructive or otherwise, of any fact which would impeach either writing or any element of the transaction. The defendant insisted that Lenora S. Popp should sign the note and accompanying agreement, that was part of the consideration upon which it extended the credit, and accepted the bonds as collateral. Mr. Popp describes the delivery as follows: "I handed him [Cashier] the bonds. He says, 'What is that?' I said 'Three bonds, I thought maybe you hold for security for the present *so I can continue in business.*'" What precedes, and there is other evidence to the same effect, supports the findings of the court that Lenora S. Popp executed said note and collateral agreement for a valuable consideration.

[4] The appellant's next contention is that the defendant bank is not a *bona fide* holder in good faith or for value of the pledged bonds. Much of what precedes is applicable to this phase of the case. The claim is made that the desperate financial condition of Popp, which had existed for months prior to the date of the note, the repeated unsuccessful attempts of the defendant to adjust the account, and the sudden appearance of the bonds tendered and accepted as collateral, coupled with Mr. Popp's declaration that they belonged to his wife, and the additional circumstance that on the margin on the outside of two of said bonds is written in ink "Alida Newell Popp," and on the margin on the outside of one of said bonds is written in ink "Mary Elizabeth Popp," should have prompted the defendant, indeed cast upon it the duty, to make "some in-

vestigation as to the true condition of the ownership of the bonds." The record discloses that the defendant did make "*some*" investigation, but, aside from that, we find no reason for holding that under the conditions and facts as they then existed, the defendant or its officers were obligated to canvass the title to these bonds with greater detail than they did. They had no reason whatever to distrust Popp or to disbelieve or doubt his statements. Further questioning of him would have elicited nothing in contradiction of his declaration that his wife owned them and that she got them back east from an aunt. This was a reasonable explanation of the ownership and their possession by him. It might also be regarded as a satisfactory apology for his failing to earlier offer them as security. The fact that the bonds were in Popp's possession, and were received by the bank from him, when taken with the recital in the collateral agreement, signed by Mrs. Popp, that they were deposited with defendant "as collateral security" for the payment of said note, justified the bank in believing, as the record discloses it did, that the bonds were so deposited with the knowledge and consent of Mrs. Popp. Not a word was said by Popp in reference to his minor children owning the bonds, and naught was said or done indicating that Popp was wrongfully hypothecating them. None of the officials of defendant knew or had reason to suspect that Popp had fraudulently removed them from the safe deposit box where the Popps claimed they were kept, and which was unknown to defendant. Moreover, Mr. Le Baron, an official of defendant, testified, which was manifestly accepted as true by the trial court, that Mrs. and Mr. Popp "came in with the bonds and executed this note for the purpose of taking up that overdraft which we were trying to wipe out." He was asked "did they hand you the bonds—these three One thousand dollar Adirondack bonds? A. Surely. Q. At that time and place did John Popp and Lenora S. Popp execute that note and collateral agreement? A. They did." So far as notice, actual or constructive, "arising from the relationship of the parties or circumstances attending the transaction," is concerned, the facts are decidedly with the bank. As has been said, the makers and pledgers were husband and wife; the account was in their joint names, and the indebtedness that of both of them; the initial de-

posit consisted of money belonging to the wife, against
which she permitted her husband to check *ad libitum,* with-
out, so far as appears, at any time requiring him to account,
or ever inquiring of the bank the status of such account.
Under these circumstances, it cannot be said the officials
of defendant were not justified in accepting as true, and
relying upon, the representations of J. Popp.

[5] It remains to inquire if the names of the minor
children, written on the margin of the bonds, constituted
notice, actual or constructive, to the bank that the children
owned them, or notice sufficient to cast upon it the duty of
making further investigation touching such ownership. The
attention of no one connected with the bank was called to
said names thereon at the time the bonds were pledged, and
the representative of defendant, who received them, testi-
fied that he had no recollection of having seen the names
at the time the bonds were deposited, although he could
not "swear" they were not there. But, even though the
officials of the bank had seen these names on the bonds, in
view of the fact, as we shall presently point out, that they
passed by delivery without indorsement, and of Mr. Popp's
unequivocal statement that his wife owned them, upon which
they were justified in relying, we hold that failure to make
further inquiry touching their ownership would not have
established a lack of good faith, or prevented defendant
from being a holder for value in due course. [6] "The
well settled rule at present, except as already noted (not
necessary to repeat here), is that mere knowledge of facts
sufficient to put a prudent man on inquiry, without actual
knowledge, or mere suspicion of an infirmity or defect of
title, does not preclude the transferee from occupying the
position of a holder in due course, unless the circumstances
or suspicions are so cogent and obvious that to remain
passive would amount to bad faith." (8 Corpus Juris,
p. 501.) But plaintiff states, referring to the same volume
of Corpus Juris, page 711, that this rule is subject to
the qualification that "where the circumstances are such as
to justify the conclusion that the failure to make inquiry
arose from a suspicion that inquiry would disclose a vice
or defect in the instrument or transaction, such indorsee is
charged with knowledge." The answer to this is that there
is no finding in the present case bringing it within this ex-

ception, and if there was such a finding it would be pure conjecture, for we discover nothing in the evidence indicating that the bank officials were intentionally omitting to pursue information through fear they might unearth something touching the ownership of the bonds in question which would compel them to reject them as security, or, if accepted, would, in the event of its being disclosed, defeat the pledge.

[7] The next contention of the plaintiff is that the bonds in question are not negotiable. We think this proposition must be sustained. The bonds were issued apparently in the state of New York on January 1, 1912. They are payable to the bearer, or to the registered holder in case the bonds be registered, and on their face they show that they are secured by a mortgage or trust deed upon real property, and they become due on January 1, 1962. The record does not show that they were ever registered. They are precisely similar in all respects to the bonds under consideration in *Kohn* v. *Sacramento etc. Co.*, 168 Cal. 1 [141 Pac. 626], and *Crocker National Bank* v. *Byrne*, 178 Cal. 329 [173 Pac. 752]. In each of those cases bonds of that description were held to be non-negotiable under the law of California in force in 1912, and the proposition must be considered as settled. The result is that the defendant cannot protect itself upon the rule, applying to negotiable instruments only, that where the holder thereof has by delivering the instrument to a third person clothed him with an apparent title thereto, and such third person disposes of it to an innocent purchaser, such purchaser obtains title as against the true owner, although the person to whom it was delivered had no authority to make a sale thereof. (*Chase* v. *Whitmore*, 68 Cal. 547 [9 Pac. 942].) It may be possible that, as the owners of these bonds were minors, it could not be said that they had clothed their parents with apparent authority to dispose of the bonds, even if they were negotiable. But that question we need not determine, for, as the bonds were not negotiable, the rule cannot apply in any event to this case. [8] The rule applicable here is that the seller of property can transfer to the buyer no better title than he has himself, and if at the time of the transfer he had no title, the purchaser, although buying in good

faith and for full value, obtains no title. (*Crocker Nat. Bank* v. *Byrne,* 178 Cal. 332 [173 Pac. 752].)

[9] The respondent concedes that the bonds were not negotiable, under the aforesaid decisions, at the time they were issued, and he relies on the fact that the legislature by an act which took effect August 7, 1915, amended our code in relation to negotiable instruments so as to make bonds such as these negotiable. If that act could have had the effect to change the character of the bonds in that particular, undoubtedly the point would be well taken and the bonds would have been clothed, at the time they were transferred to the defendant, in 1916, with all the characteristics of negotiable instruments. But it is well established that the legislature cannot by an act subsequent to the execution of a contract change its legal effect in any material particular. In section 871, volume 1 of Daniel on Negotiable Instruments, that author says: "The law in force at the time the contract is made must apply to it with respect to its interpretation and effect, *otherwise the legislature would itself make a contract for the parties.*" (Italics ours.) This proposition is established by the decisions in *Cook* v. *Mutual Insurance Co.,* 53 Ala. 37; *Bloodgood* v. *Cammack,* 5 Stew. & P. (Ala.) 276, and *Bowlby* v. *Kline,* 28 Ind. App. 662 [63 N. E. 723]. The statements in 8 Corpus Juris, at sections 173 and 184 of the article on Bills and Notes, to the effect that the contract made by an indorsement or transfer of an instrument is governed by the law in force at the time such indorsement is made, refers wholly to indorsements or transfers of instruments which are in fact negotiable. The entire text of the sections refers to instruments which are negotiable. The cases cited in support of these sections show that the subject treated was the effect of the contract of indorsement and not the character or effect of the instrument transferred or indorsed. The bonds were apparently executed in the state of New York. There was no proof or finding with respect to the law of New York on the subject of negotiable instruments of this character. Consequently, under the well-settled rule, we must assume that the law of that state on the subject is the same as the law of California. It seems to be settled that the law of the place of the execution of the contract determines its character and effect. But as the

question is not before us we need not express any opinion on the subject. That question will have to remain open for future determination in case upon a new trial the evidence may show a different law in New York from that which prevails here. For these reasons we are of the opinion that the defendant, under the facts found, had no title to the bonds in controversy, and that the plaintiff should have judgment.

The judgment is reversed.

Wilbur, J., Shaw, C. J., Sloane, J., and Lawlor, J., concurred.