[Civ. No. 4655. First Appellate District, Division One.—August 29, 1924.]

JOHN C. LYNCH, as Receiver, etc., Appellant, v. INTERNATIONAL BANKING CORPORATION (a Corporation), Respondent.

[1] FINDINGS—QUESTIONS OF FACT—OPINION OF TRIAL JUDGE.—The written opinion of the trial judge (which is introduced in evidence at the hearing on motion for a new trial) cannot be substituted for the findings in the consideration of plaintiff's appeal from the judgment in favor of defendant, and the findings of fact, although not in conformity with such opinion, must be taken as embodying the conclusions of the trial court upon all questions of fact submitted to it for its decision.

[2] CONVERSION—OWNERSHIP OF BONDS BY CORPORATION—PLEDGE BY PRESIDENT—ESTOPPEL—EVIDENCE—FINDINGS.—In this action in conversion for the value of certain non-negotiable bonds which had been pledged with defendant by the president of the corporation of which plaintiff was receiver, from the evidence showing that the said president (who was also the executive officer) of said corporation had practically entire control of all its affairs, financial and otherwise, that he had general supervision of all its business, property, and interest, that he had been given a free hand in dealing with the purchase and sale of bonds of the corporation, that he frequently had in his custody securities belonging to the corporation, that he was permitted to go to the safe-deposit box of the corporation and put in and take out whatever he wanted, that as president he had and exercised plenary powers over the affairs of the corporation, which gave him something more than mere access to its strong box, and that the indebtedness which the bonds in question were pledged to secure, although made in his individual name, was incurred in a transaction intended to be for the benefit of said corporation, the trial court was justified in finding and determining that plaintiff was estopped to say that said bonds were wrongfully or unlawfully taken from said corporation, or that the said president had not the right to deliver them to defendant in

pledge, or that they were converted by defendant when it caused them to be sold and the proceeds applied to the payment of such indebtedness.

[3] ID.—APPARENT OWNERSHIP—PLEDGE IN GOOD FAITH—ESTOPPEL.— One who has allowed another to assume the apparent ownership of property for the purpose of making any transfer of it cannot set up his own title to defeat a pledge of the property, made by the other, to a pledgee who received the property in good faith, in the ordinary course of business and for value.

---

(1) 4 C. J., p. 775, sec. 2722 (Anno.).   (2) 14a C. J., p. 408, sec. 2257.   (3) 21 C. J., p. 1176, sec. 180.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. George A. Sturtevant, Judge. Affirmed.

The facts are stated in the opinion of the court.

A. A. DeLigne and Hiram W. Johnson, Jr., for Appellant.

Marcel E. Cerf, C. H. Sooy and M. P. Bruton for Respondent.

ST. SURE, J.—Plaintiff, as receiver of the Pacific Coast Casualty Company, sued in conversion for the value of eighteen bonds. Defendant, after generally and specifically denying the allegations of the complaint, pleaded special defenses of estoppel and ratification. Trial resulted in a judgment for defendant upon each and every issue.

The learned trial judge wrote an opinion in the case which was introduced in evidence at the hearing on motion for a new trial. Appellant contends that this "opinion" is contrary to the findings, and that as the former represents the true conclusions of the trial judge, the lower court "should have either granted a new trial or required defendant to agree to a modification of the findings as a condition for not granting the new trial." [1] Appellant concedes, as he must, that the "opinion" of the trial judge cannot be substituted for the findings in the consideration of this appeal. "The findings of fact must be taken as embodying the con-

---

3.   See 21 Cal. Jur. 299.

clusions of the trial court upon all questions of fact submitted to it for its decision." (*Goldner* v. *Spencer*, 163 Cal. 317, 320 [125 Pac. 347, 348].) See, also, *Scholle* v. *Finnell*, 173 Cal. 372, 376 [159 Pac. 1179], and *White* v. *Merrill*, 82 Cal. 14, 15, 16 [22 Pac. 1129]. In this connection we may well observe that the appellate courts of this state have frequently had occasion to say that they are not at all interested with the processes of reasoning by which the trial court reached its conclusions, as the former probably will be wrong while the latter may be right. (*Unger* v. *San Francisco-Oakland Terminal Rys. et al.*, 61 Cal. App. 125, 137 [214 Pac. 510].)

[2] The findings of the trial court comprehensively cover the issues and facts. Briefly the court found, in part, that the Casualty Company was the owner of the eighteen bonds. That the bonds were not negotiable. That by reason of all of the facts, set forth in considerable detail and found to be true, "the plaintiff is estopped from saying and ought not be permitted to maintain that said bonds were wrongfully or unlawfully taken from Pacific Coast Casualty Company or that the said Green had not the right to deliver them to defendant in pledge as aforesaid, or that they were converted by defendant or that Pacific Coast Casualty Company or plaintiff has any right to said bonds or any claim for damages for their conversion." The trial court further found that the Casualty Company ratified the acts of E. F. Green, its president, in borrowing money from defendant and pledging the bonds to secure the payment of the money so borrowed.

The question determinative of this appeal is that of estoppel. The trial court found that the bonds were owned by the Casualty Company "but they were not nor were any of them, wrongfully and without authority taken by said E. F. Green, but they were, and each of them was, delivered by way of pledge to the defendant . . . by said Green to secure the payment of the individual promissory note given by said Green to said International Banking Corporation; that at said time said bonds were not in the actual possession of the Casualty Company otherwise than by being in the possession of said Green as such president; that the said Green was at said time entrusted by said Pacific Coast

Casualty Company with the custody of said bonds.'' Appellant says in his brief that ''Green was not entrusted with the possession of the bonds taken from the safe-deposit box. He stole them from the company's box, or took them without authority and converted them to his own use, and was clearly guilty of larceny.'' In such situation a review of the evidence becomes necessary. It shows the following facts:

The Pacific Coast Casualty Company, a California corporation, was organized in 1902 by E. F. Green, who became president of the company upon its organization and remained such until July, 1913. Frank P. Deering was a director and general counsel of the company. The company was organized to carry on general liability insurance business. Green had the confidence of the public, of his company, his directors, and officers. He had practically entire control of all affairs of the company throughout the time he was its president. He handled the purchase and sale or pledge of bonds of the corporation, it being his practice to go to the safe-deposit box of the company and take out or put in whatever he wanted; the person accompanying him frequently not knowing what Green was doing. At times Green kept securities of the company in his own custody, and at least on one occasion he pledged securities of the company to secure money borrowed for its use. No memorandum was ever made in the books of the company of any of these transactions. No one, from 1902 to 1913, ever objected to any method he pursued in carrying on the business of the company. The powers conferred upon Green as president by the company's by-laws were as follows:

''The President shall . . . be chief executive officer of the Corporation having general supervision of all its business, property and interests . . . shall sign all . . . contracts and documents in writing . . . and shall have general supervision over all its property, concerns and employees, subject to the control of the Board of Directors. He shall decide, subject to the control of the Executive Committee, upon all risks taken by the Company . . . He shall have charge, by and with the approval of the committee on finance, of making all the investments of the company's funds. He shall be . . . chairman of the finance and executive committee.''

The affairs of the Casualty Company seem to have flourished from 1902 until about the autumn of 1912, when Marshall Frank, who a year before had become a director of the company, acquired control of the capital stock of the company, owning 2,000 shares of the 4,000 issued shares. Green felt that Frank's ownership of the stock and the policy he was imposing upon the company was working its insolvency. Deering and others interested in the company shared that opinion. Facts are shown in the record as the basis for such opinion.

The elimination of Frank from the control of the company entailed the purchase of his 2,000 shares of stock at the price of $150 per share. The work to bring about this result began in the autumn of 1912. Green went to Deering and laid before him a plan for the formation of a syndicate to purchase 1,500 shares at $150 per share for resale at a profit to the members of the syndicate; and the purchase by someone for the company itself of the remaining 500 shares at $150 per share for distribution without profit through agents of the company at districts and points where the interests of the company would be advanced through the medium of new friends and new business, which would be produced through the medium of new stockholders. Deering and Green both considered that the company could not trade in its own stock and that the transaction in the 500 shares would need to be carried out in the name of some individual. They discussed the matter of the loan which would be needed to complete the purchase. Green discussed with Deering the matter of having the loan in his own name. Deering raised the point that that might lead to criticism because Green was head of the company. Green responded that that might be true, and that therefore he was willing that the transaction should be carried out in the name of any other person connected with the company who would be willing to sign the notes, and Green asked Deering to suggest someone who would serve the purpose. Names were mentioned but it was felt that the persons would not consent and finally Green said that it was "up to" him as the head of the company which he had formed, to put the deal through in his own name, and that he feared no comments in regard thereto. Green testified he had no intention to gain any

profit from the transaction.   Green could not buy the stock
without borrowing the money to pay for it, and to borrow
the money it was necessary for him to have security and he
took up this matter with Mr. Lichtenstein, who was then the
manager of the surety department of the Globe Indemnity
Company.   Lichtenstein had been connected with the Pacific
Coast Casualty Company as director from October, 1911, to
August or September, 1912, and Green had discussed with
him the necessity of buying Frank's stock and thus elimi-
nating the latter from the control of the company.   Lichten-
stein knew that Green was president and a director of the
Casualty Company, and understood that he was borrowing
the money to buy the 500 shares for the purpose of elimi-
nating Frank and then reselling the stock.   Green asked
Lichtenstein for an indemnity bond on the part of the Globe
Company in favor of the International Banking Corporation,
guaranteeing the payment to the latter to the extent of
$12,500 of Green's note for $62,500, part of the purchase
price of the 500 shares of stock.   Before Lichtenstein would
consent to give the bond he required a counter-indemnity
bond on the part of the Casualty Company, that is to say
a bond by the Casualty Company whereby it, in turn, agreed
to hold the Globe harmless on the latter's bond to the Inter-
national Banking Corporation.   Lichtenstein also required
the opinion of the general counsel of the Casualty Company,
Mr. Deering, that the counter-indemnity bond was valid.
After laying the matter fully before Mr. Deering the latter
wrote the Globe Indemnity Company a letter stating that
the indemnity agreement was a valid obligation.   The letter
from Deering satisfied both Green and Lichtenstein, but it
was understood between them that if Lichtenstein's home
office objected to the guaranty provided by the counter-
indemnity bond, then the Globe would be provided with
securities acceptable to the home office.   The counter-indem-
nity bond was executed by the Casualty Company in the
usual manner, by Green as president, and by Mr. Morgan
as assistant secretary of the company, and the seal of the
company was attached.   The bond was executed in all re-
spects as other bonds of the company were executed except
that in this case there was the extraordinary feature that
the bond was accompanied by the opinion of the general

counsel of the company that the bond was a perfectly valid obligation. No premium was paid on the bond and no security was given to the company on the undertaking, and no record of its issuance was made because it was considered that the bond was in fact being written for the company itself in its own interest and merely as a temporary expedient pending the resale of the shares. There was no concealment in the matter of the bond. Before it was issued it had been fully discussed with Mr. Deering, a director and general counsel of the company; it had been discussed with Mr. Lichtenstein, the manager of a rival concern engaged in the same line of business, and it was known to the assistant secretary of the company, who signed the bond. It was the kind of bond which the company was then engaged in issuing, and the company was authorized by its articles of incorporation to write such a bond and the by-laws of the company gave the president the power to decide (subject to the control of the executive committee, of which Green was chairman) upon all risks taken by the company. It appears that that control was not exercised in any instance because no resolution was ever adopted authorizing any risk for the obvious reason that a bond business could not be carried on in that way. The Casualty Company gave to the Globe Company this counter-indemnity bond and the opinion of its counsel and received from the Globe Company the latter's bond and delivered it to the International Banking Corporation and the bank then paid out the $62,500 to Frank on the purchase price of the stock.

The International Banking Corporation was engaged in general commercial and foreign banking business, lending money and taking collateral to secure the payment thereof. Green's application for a loan by it of $62,500 was granted and the bank lent him that amount on January 27, 1913, taking his ninety-day note secured for payment by the pledge of the 500 shares of stock and the guaranty bond of the Globe Indemnity Company for $12,500. The guaranty bond was delivered to the bank by Green after he had obtained it from Lichtenstein. The loan was made in the regular course of business at the bank through E. W. Wilson, its manager, at the current rate of interest, six per cent, and no brokerage or anything of that sort was required. About sixty days after

the counter-indemnity bond had been issued to the Globe
Indemnity Company by the Casualty Company, Lichtenstein
informed Green that the home office of the Globe had made
some objection to the counter-indemnity bond and Green
then deposited with Lichtenstein $13,000 of bonds of the
Pacific Electric Railway Company, to cover the objection,
as security to the counter-indemnity bond. These are a part
of the bonds which constitute the subject matter of this
action. They were delivered to the Globe Company, not to
the defendant. Green got the $13,000 of bonds from the
safe-deposit box of his company at the Mercantile Trust
Company and placed them at the Globe Company to secure
the performance of the obligation of his company which
theretofore had been incurred. He did not consider it neces-
sary to have a resolution from the directors or executive
committee or finance committee. These $13,000 of bonds
had been kept in the box of the Casualty Company at the
safe-deposit vault of the Mercantile Trust Company. Access
to that box was permitted, by virtue of a resolution or by-
law of the company, to any two directors of the company,
and the rule and the names of the directors from time to
time were certified by the Casualty Company to the safe
deposit company. The name of Mr. Green as one of the
directors who, with one other, could have access to the box
had been certified to the Mercantile Trust Company, and on
October 24, 1911, the name of Lichtenstein was certified to
the Mercantile Trust Company as being one of the directors
and consequently eligible, with one other director, to access
to the box of the Casualty Company. However, although
Lichtenstein ceased to be a director of the Casualty Com-
pany in August or September, nevertheless, the Casualty
Company failed to notify the Mercantile Trust Company of
that fact until May 13, 1913, so that when Green went to
the box to get the $13,000 of bonds to give to Lichtenstein,
as manager of the Globe, to hold as collateral to the Casu-
alty Company's indemnity bond, he was able to have access
when accompanied only by Lichtenstein, whose retirement from
the Casualty Company that company had failed to certify
to the Mercantile Trust Company. This neglect on the part
of the Casualty Company permitted access to its box to be
had by in fact only one director, Lichtenstein, at that time

attending only as manager of the Globe Company for the purpose of receiving the $13,000 of bonds to place in the box of the Globe Company in the same vaults. The Mercantile Trust Company did not know this. The Mercantile, as far as it had been advised by the Casualty Company, believed that Lichtenstein continued to be a director of that company and believed that he was attending its vaults as such when Green took the $13,000 of bonds and gave them to him.

The note of Green for $62,500 fell due April 28, 1913, and not being paid, Wilson, the manager of the bank, demanded payment from Green and notified the Globe Company that he looked to it on its undertaking for $12,500. This meant that the Globe would make claim on the Casualty Company by virtue of the latter's counter-indemnity bond, and in lieu of that Green arranged to deposit with the bank sufficient collateral so that the loan might be extended and the Globe bond returned to the Globe and the Casualty Company bond returned to the Casualty Company.

Green wanted an extension of the note because he had not carried out the resale as planned, although he still felt that he could do it. Green asked Wilson to accept $18,000 of bonds, describing them, and give a thirty-days' extension of the debt and cancel and relinquish the Globe Indemnity Company bond. Wilson acquiesced. Green brought the $18,000 of bonds to the bank and delivered them to Wilson. Wilson extended the debt by taking three new notes for the aggregate of $62,500, all payable in thirty days, secured for payment by the pledge of the $18,000 of bonds; and Wilson canceled the Globe bond and surrendered it to Green and Green delivered the surrendered bond to the Globe and received from the latter the counter-indemnity bond of the Casualty Company canceled by the Globe. The $18,000 of bonds thus received by the bank, on April 28, 1913, are the bonds which form the subject matter of this action. Of these $18,000 of bonds, $13,000 of them are the identical bonds which up to this moment had been held by the Globe as security for the counter-indemnity bond of the Casualty Company and $5,000 of them are Pacific Gas Improvement Company bonds which up to that time had been pledged with the stock broker Sutro, to secure the payment of money

which he theretofore had lent to the Casualty Company.
Green did not get these $5,000 Pacific Gas Improvement
bonds from the safe-deposit vaults at the time he delivered
them to the bank, nor did he get them at the same time that
he delivered the $13,000 of bonds to the Globe.   The $5,000
of bonds were never in the possession of the Globe.   Immedi-
ately before they were delivered to the bank they had been
in the possession of the stock broker Sutro, where Green got
them and took them to the bank.   The $5,000 Pacific Gas
Improvement bonds had been given by Green to Sutro for
sale for the account of the Casualty Company.   This was
entirely a company transaction performed by Green as presi-
dent of the Company and for and as the act of the company.
Later it was decided that the market was not at the time
favorable for an advantageous sale of these particular bonds,
and in lieu of making a sale the company borrowed from
Sutro $8,000, and left the bonds as security for the loan.
This was a company act.   Sutro paid the money to the com-
pany and the company used the money to pay a dividend
on its capital stock.   At a later date the company repaid to
Sutro the $8,000 theretofore borrowed, and Sutro returned
the security, that is, he delivered to Green, as president of
the company, for the company and as the company's prop-
erty, $10,000 of Pacific Gas Improvement Company bonds
theretofore pledged with him.   Green rightfully received the
bonds as president of the Casualty Company, and he re-
turned one-half of the bonds to the vaults of the company
and the other half, that is $5,000 of the bonds, he took di-
rectly from Sutro's office to the International Banking Cor-
poration and there pledged them as part of the collateral to
the $62,500 notes, at the time the extension was given.   These
$5,000 of bonds comprise a part of the subject matter of
this action.

When Green delivered the $18,000 of bonds in pledge to
the International Banking Corporation, the latter gave him
a receipt therefor and he placed that receipt in the Casualty
Company's deposit box at the Mercantile Trust Company.
The certified public accountants who audited the Casualty
Company's books accepted this receipt as accounting for the
$18,000 of bonds.

It was admitted at the trial that the bonds were valid bonds of the issuing companies, and that the issuing companies had no defense to them, and would have so stated if the respondent had so required.

Wilson had no notice or knowledge that Green had received any of the securities as an officer or director or agent of the Casualty Company, or that he held them as such, and if he had had any such notice or knowledge he would not have extended the loan or released the Globe bond. Wilson did not know that the bonds had ever been pledged with the Globe.

Green did not pay the extended notes in whole or in part.

In May, 1913, knowledge first came to the directors of the Casualty Company that Green had taken the bonds and pledged them with the defendant. The precise date of the discovery does not appear but the record shows that in April, 1913, Director Turner was instructed by the executive committee to examine the securities of the company and did so with Director Kittle, and from that examination they found that the bonds in the safe-deposit box did not check with the list. They asked Green as to where the missing bonds were and he told them. He told them about the loan he had made at the bank. On May 27, 1913, at a meeting of the executive committee, Director Turner reported the result of the examination made by Director Kittle and himself concerning the securities of the company. Two days later, on May 29, 1913, Green, in writing, conveyed to James Walter Scott the 500 shares of the capital stock of the Casualty Company described as being then in the possession of the International Banking Corporation and pledged to secure the payment of the promissory note. Three months later, September 5, 1913, the Casualty Company made its contract with Cutler Paige for the sale of 500 shares of stock; said contract contains the following recital: "And whereas, the said Green did heretofore assign to J. W. Scott, all his right, title and interest, in and to the said 500 shares of stock of the Pacific Coast Casualty Company, pledged with the International Banking Corporation, said assignment having been made for the purpose of transferring to said Pacific Coast Casualty Company the equities held by said Green in said stock; . . . "

Green's resignation as president is dated June 10, 1913, but when it was presented or accepted, whether in June or July, does not appear clearly from the record.

The $62,500 of notes were not paid at maturity, and the bank on August 21, 1913, sold the pledged bonds. With the proceeds of this sale and the proceeds derived from the sale of the stock to Paige, the bank received payment of the debt of $62,500. The sale of the bonds was fairly made at a public session of the stock exchange at San Francisco for their full market value.

Appellant earnestly argues that from these facts the conclusion is inevitable that Green stole the bonds or at least that he took them without authority and converted them to his own use. The cases of *Yamato* v. *Bank,* 170 Cal. 351 [146 Pac. 826] , *Crocker National Bank* v. *Byrne and McDonnell,* 178 Cal. 329 [173 Pac. 752] , *Kohn* v. *Sacramento E. G. & Ry. Co.,* 168 Cal. 1 [141 Pac. 626] , *Chase* v. *Whitmore,* 68 Cal. 545 [9 Pac. 942], *Fowles* v. *National Bank of California,* 167 Cal. 653 [140 Pac. 271] , *Northwestern P. C. Co.* v. *Atlantic P. C. Co.,* 174 Cal. 308 [163 Pac. 47] , *Grange* v. *Judah Boas Co.,* 60 Cal. App. 484 [213 Pac. 712] , *Wenban Estate* v. *Hewlett,* 42 Cal. App. Dec. 77, *Popp* v. *Exchange Bank,* 189 Cal. 296, 304 [208 Pac. 113], are cited in support of such contention.

We think that the facts in the case before us are distinguishable from those in each of the cases cited. In the Yamato case it appears that Inui, secretary for the plaintiff, took the stock from the safe of his employer and pledged it as security for his promissory note. The learned author of the opinion in discussing the evidence in relation to the question of estoppel says (p. 354 [149 Pac. 827]) : "All that appears is that Inui, the trusted secretary, had or obtained access to the safe in which the note with its collateral was deposited. He abstracted this stock and pledged it with the defendant. Plaintiff did not discover this abstraction until some time thereafter." In the instant case the facts are materially different. Green was president of the Casualty Company, and as such had practically entire control of all its affairs, financial and otherwise. As president he not only had access to securities of the company, but he had the right of possession as well. He was chairman

of the finance and executive committee. Under the by-laws he was the "chief executive officer of the corporation, having general supervision of all of its business, property and interests." He was given a free hand in dealing with the purchase and sale of bonds of the corporation. Frequently he had in his custody securities belonging to the company, at one time bonds of the value of $65,000. He was permitted to go to the safe-deposit box of the company and put in and take out whatever he wanted. No record of any of these transactions was kept in the books of the company. Inui was a "trusted secretary of the Yamato corporation" and "had or obtained access to the safe." Green as president of the Casualty Company had and exercised plenary powers over the affairs of the company which gave him something more than mere access to the strong box of the company. Colloquially, so far as the company's affairs were concerned, it may be said that Green was the whole thing.

In *Crocker National Bank* v. *Byrne and McDonnell, supra,* page 331 [173 Pac. 753], "the defendants obtained possession of the bonds in the following manner: Baker was an assistant cashier of the bank, and his duties were of such a character that he necessarily had access to the vaults of the bank and to the bonds kept therein. He had authority to take them out of the vaults to have the interest coupons detached, or for presentation for payment at maturity, but he had no other authority to remove said bonds, and no authority to negotiate or dispose of the same." Baker, it was held, stole the bonds.

In *Chase* v. *Whitmore* the owner left the note with Schell, not Treat, but Treat, not Schell, stole the note and sold it. "Schell bought the note . . . for plaintiff and paid for it with her money . . . Schell received the note and placed it in an envelope on which he wrote the plaintiff's name, and then placed the note and envelope in a safe in his office. Shortly afterwards he reported the transaction to the plaintiff who was satisfied with it . . . The note remained in the safe where it was placed until June, 1881, when, without the knowledge of plaintiff or Schell, Treat took it out and sold it to defendant. . . . The appellant . . . did not clothe Treat with any apparent title or power of disposition over the note. When it was bought for plaintiff it had the blank

endorsement of the payee on its back, and was then deposited in his safe by Schell. . . . Schell and Treat, who were law partners, became then merely the depositaries or bailees of the note for the plaintiff.'' This case more strongly supports the contention of appellant than any other cited by him, and yet we think it is clear that the facts are quite different from those of the instant case.

*Fowles* v. *National Bank of California* is cited by both appellant and respondent. According to the syllabus of the case, it was held that ''where the owner of corporate stock indorses the certificates in blank and delivers them to the payee of his promissory note to secure the payment thereof, and thereafter the payee of the note, without the knowledge of the owner of the stock, separates the certificates from the note to which they were pinned when delivered, and hypothecates them as collateral security for payment of his own indebtedness to a bank upon the representation that he is the true owner of the stock, the bank may retain the stock as security for the payment of the debt due to it, and the original pledgor cannot recover possession thereof.''

In *Northwestern P. C. Co.* v. *Atlantic P. C. Co.*, it was held ''that the real owner of corporate stock who has permitted a third person to hold the apparent title to, and power of disposition over the shares, is estopped from asserting its title as against a *bona fide* pledgee of the apparent owner. Under such circumstances the equities of the pledgee are superior to those of the real owner.''

In *Popp* v. *Exchange Bank* a guardian brought action against the bank to recover the possession of non-negotiable bonds which were alleged to be the property of plaintiff's minor children, and which had been delivered to the defendant bank by her husband as collateral security for the payment of their promissory note to cover an overdraft of their joint account. Evidently appellant calls our attention to this case because it cites with approval *Chase* v. *Whitmore* and the Kohn and Crocker cases heretofore mentioned. The decision reiterates the rule applicable in all such cases, that the seller of the property can transfer to the buyer no better title than he has himself, etc., and held, among other things, that the defendant bank had the right to rely upon the representation of the husband that the bonds were owned by the wife,

but the bank could not retain them because they had been "fraudulently removed" by Popp (p. 302).

In *Kohn* v. *Sacramento E. G. & Ry. Co.* the bonds were stolen, and the general rule was applied as in the Yamato and Crocker cases, which is, that the seller of ordinary property can transfer to the buyer no better title than he has himself, and that if such property has been lost by the true owner, or stolen from him, one who buys from the finder or from the thief, though he pays full value and buys in good faith, without notice, obtains no title as against the true owner. Appellant says, in his brief, that "the exception is that where the real owner does something more than to merely deliver possession to another, evidencing ownership or power to transfer in the person to whom delivery is made the owner will be bound by the other's act. Evidence of ownership flowing from mere possession has been repeatedly and consistently held as insufficient as a basis for estoppel. If the Pacific Coast Casualty Company had endorsed the bonds in a manner to transfer its title to them, or if it had given Green a written assignment of them, or if it had given him a power of attorney to sell or pledge them, as in the Judah Boas case, or if it had permitted Green to purchase and hold the bonds in his own name, then the case would come within the principle of the cases above cited."

From the evidence we think it is plain that Green had something more than the mere naked possession of the bonds. Written assignment or indorsement or power of attorney to sell or pledge is not the sole criterion of Green's authority in the premises. Referring to the eighteen bonds involved, it is the undisputed fact that five of them were delivered to Green as president of the company by Sutro when the company's debt for which they were pledged had been paid; that the remaining thirteen were taken by Green from the company's safe-deposit box at the Mercantile Trust Company and placed with the Globe Company to secure the performance of an obligation of the Casualty Company. This was the obligation which the general counsel of the Casualty company had certified was valid. Access to the vault where the bonds were kept was permitted by virtue of a by-law to any two directors of the company, the names of such directors being from time to time certified by the Casualty Com-

pany to the Trust Company. Green and Lichtenstein had both been certified as directors eligible to access to the box. At the time the bonds were taken from the box Lichtenstein was no longer a director of the Casualty Company, but the company neglected to notify the trust company of that fact. The bonds were thereafter delivered to Green as president by the Globe Company when that company's bond for which they were collateral was released. Thus, it would appear, all of the bonds came rightfully into Green's possession. His act in pledging the bonds for the payment of a personal obligation, which he asserts he incurred for the benefit of his company, may not be free from criticism, but before it can be denominated fraudulent or criminal Green is entitled to the benefit of the doubt. In this connection the thought occurs that had Green's plan been successfully carried out, or had the Casualty Company's subsequent transaction with Paige proved profitable to the company, Green's sin would have been forgiven readily. And however Green's act may be defined, is not this the test: Can it be truthfully said, under all of the facts and circumstances, that the Casualty Company may be considered as having done enough, through its negligence and in allowing Green to appear as the owner of or as having the full power of disposition over the property, to be estopped as against a pledgee in good faith for value? The findings of the trial court, amply supported by the evidence, speak affirmatively in this regard, and we are of the opinion that such findings are correct. There is nothing contrary to this view in either *Wenban Estate* v. *Hewlett* or *Grange* v. *Judah Boas Co., supra.* Indeed, in the latter case we find law which is applicable to the problem before us. [3] The supreme court calls attention to the rule that "one who has allowed another to assume the apparent ownership of property for the purpose of making any transfer of it, cannot set up his own title to defeat a pledge of the property, made by the other, to a pledgee who received the property in good faith, in the ordinary course of business and for value." (Civ. Code, sec. 2991.) This rule is but an application of the equitable doctrine of estoppel, one of the expressions of which is found in the maxim that "when one of two innocent persons must suffer by the act of a third, he by whose negligence it happened

must be the sufferer.'' (Civ. Code, sec. 3543; *National Bank of San Mateo* v. *Whitney,* 181 Cal. 202, 205 [8 L. R. A. 298, 183 Pac. 789]; *Brittain* v. *Oakland Bank of Savings,* 124 Cal. 282, 289 [71 Am. St. Rep. 58, 57 Pac. 84]; *Security Mortgage Co.* v. *Delfs,* 47 Cal. App. 599, 602 [191 Pac. 53].)

It must be apparent from the views herein expressed that we deem the question of ratification immaterial and discussion thereof unnecessary.

The judgment and order are affirmed.

Tyler, P. J., and Knight, J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on October 27, 1924.

All the Justices concurred.